**BLACK + VERNOOY ARCHITECTS, J. Sinclair Black, and D. Andrew Vernooy, Appellants,**

v.

**Lou Ann SMITH; Jimmy Jackson Smith, Individually and as Next Friend of Rachel and Grayson Smith; and Karen E. Gravely, Appellees.**

No. 03–09–00518–CV.

Court of Appeals of Texas, Austin.

Aug. 5, 2011.

J. Bruce Bennett, Cardwell, Hart & Bennett, L.L.P., Austin, for Appellants.

Broadus A. Spivey, Spivey & Grigg, L.L.P., Austin, for Appellees.

Before Chief Justice JONES, Justices PURYEAR, PEMBERTON, HENSON, ROSE, and GOODWIN.

## OPINION

DAVID PURYEAR, Justice.

Our opinion and judgment issued on December 8, 2010, are withdrawn, and the following opinion is substituted.

Appellees Lou Ann Smith, Jimmy Jackson Smith, individually and as next friend of Rachel and Grayson Smith, and Karen E. Gravely (collectively, the "Smiths") sued appellants Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy (collectively, the "Architects") for negligence in connection with injuries suffered by Lou Ann Smith and Karen Gravely when the second-floor balcony of a friend's home collapsed while they were standing on it.[1] A jury found that the injuries were partially caused by the negligence of the Architects. The Architects appeal the jury's determination. Because the Architects owed no duty to the Smiths

as a matter of law, we will reverse the judgment of the district court.

## BACKGROUND

In October 2000, Robert and Kathy Maxfield hired the Architects to design a vacation home for them. When the Maxfields hired the Architects, they signed an agreement based on forms promulgated by the American Institute of Architects that are used nationwide. As directed by the agreement, the Architects designed the Maxfields' residence and prepared the construction drawings and specifications. The proposed design had a balcony off the master bedroom.

After hiring the Architects, the Maxfields later hired Steve Nash of Nash Builders, Inc. as the general contractor for the project. When Nash was hired, the Maxfields and Nash entered into a construction contract that was also based on forms promulgated by the Institute and that explicitly incorporated terms from those forms. Under the contract, Nash was responsible for building the home and was authorized to hire subcontractors to facilitate the construction. During the construction, Nash hired a subcontractor, Steven Rodriguez, to build the balcony.

When Rodriguez built the balcony, he did not do so in compliance with the design drawings. The design drawings required that the metal pipes supporting the balcony be welded to steel plate tabs, which would then be bolted to the balcony. As constructed, however, the metal support pipes were attached to the balcony using thin metal clips. The design drawings also required that a metal support piece, referred to as a "joist hanger," be used to reinforce the attachment of each of the balcony joists to the exterior wall of the

---

1. Although we will generally refer to the parties by their collective names, we will also refer to them individually when necessary.

house. In the actual construction of the balcony, however, no joist hangers were used. Although required by the design drawings, the balcony handrail was not bolted to the house. Finally, the design drawings called for the balcony to be attached to the exterior wall of the house by bolting it to a one-and-one-half-inch-thick rim joist and another one-and-one-half inches of wood blocking. Despite these specifications, the balcony was not attached to the house using bolts, a rim joist, and blocking, but was instead nailed to a one-half-inch piece of plywood.

Over a year after the home was completed, Karen Gravely and Lou Ann Smith visited the Maxfields' vacation home. At some point during the visit, Karen and Lou Ann stepped out onto the upstairs balcony. A few seconds later, the balcony separated from the exterior wall of the home and collapsed, causing the two women to fall approximately twenty feet to the ground. Lou Ann was rendered a paraplegic as a result of the injuries that she suffered in the fall, and Karen suffered a broken finger, a crushed toe, and multiple bruises.

Karen and the Smith family sued the Maxfields, Nash, and the Architects for negligence in connection with the collapse of the balcony. Nash and the Maxfields settled prior to trial. Under the terms of the settlement, Nash agreed to pay $1.4 million, and the Maxfields agreed to pay $250,000. Ultimately, a jury trial was held to address the issue of the Architects' liability. A jury found that the injury was caused by the negligence of (1) the Architects who designed the home, (2) the general contractor who built the home, and (3) the framing subcontractor who installed the balcony. The jury attributed 10% of the responsibility to the Architects, 70% to Nash (the general contractor), and 20% to Rodriguez (the subcontractor). Based on the jury's findings related to damages and proportionate responsibility, as well as adjustments for medical expenses actually paid, the district court rendered judgment that the Smith family recover a total of $380,749.19 from the Architects, plus prejudgment interest, and that Karen recover nothing from the Architects.[2]

The Architects appeal the judgment of the district court.

## PRELIMINARY STATEMENT

Before addressing the issues raised on appeal, we feel it is necessary to provide a little background regarding what we are charged with deciding in this case and what decisions we are not faced with. Unquestionably, Karen and Lou Ann were injured, Lou Ann suffering what can only be described as catastrophic injuries, as a result of their innocent decision to stand on a balcony that they reasonably and justifiably believed was properly built. It wasn't. And Lou Ann's life and the lives of her family members have been irrevocably damaged as a result.

In this case, we are not being asked to make any decisions regarding whether the Smiths were entitled to recover from the homeowners, nor have we been asked to determine whether the Smiths may recover from the general contractor and subcontractor whose abysmal building practices

---

**2.** The district court did not consider the settlement amounts received from Nash and the Maxfields when calculating the amounts owed to the Smiths because the Architects' proportionate share of the damages was smaller than the total damages award minus the total settlement amount. *Compare* Tex. Civ. Prac. & Rem.Code Ann. § 33.012(b) (West 2008) (specifying that amount of damages must be reduced by dollar amounts of all settlements), *with id.* § 33.013 (West 2008) (explaining that defendant is liable only for percentage of damages equal to that defendant's proportionate responsibility, provided responsibility does not exceed 50%).

led to this terrible tragedy. Furthermore, we stress that in this appeal there has been no allegation that the Architects negligently designed the balcony or that the Architects actually created the defects at issue. To the contrary, the Smiths allege that the defect was caused by the construction practices of the contractor and subcontractor when the balcony was not built in accordance with the design plans of the Architects. Similarly, the jury was not asked to determine whether the Architects were liable under a negligent-undertaking theory.[3] Finally, and perhaps most importantly, we have not been asked to make any determination regarding any duty that the Architects owed to the owners of the home (the Maxfields) or the extent of that duty; instead, we have only been asked to decide whether the contractual duty that the Architects owed to the homeowners also extended to the Smiths.

Unquestionably, the Architects entered into a contractual agreement in which they agreed to make periodic visits to the construction site, to report observed deviations from the design plans to the Maxfields, and to guard the Maxfields against defects in the construction of the home; however, the Smiths and the dissent ask us to do something that has never been done in the history of Texas jurisprudence: they request this Court to transform and extend the contractual duty owed to the Maxfields into a common law duty owed to the Smiths as visitors to the Maxfields' home. Although our sympathies extend to the Smiths for the suffering they have unjustly been forced to endure, this Court simply cannot create a new common law duty in order to uphold the relief that they sought against the Architects.

Generally speaking, one has no duty to protect an individual from a third party in the absence of a special relationship between the potential actor and the individual or in the absence of a relationship that imposes a duty on the potential actor to control the third party's behavior. *See* Restatement (Second) of Torts §§ 314, 315 (1965). Neither of those circumstances are present in this case. Seemingly acknowledging that the law does not impose a duty on architects to protect house guests of their clients, the Smiths and the dissent suggest that this Court create a common law duty where none has existed before. The creation of a new common-law duty is a task better suited for the supreme court, not intermediate appellate courts, *J.P. Morgan Chase Bank v. Texas Contract Carpet, Inc.*, 302 S.W.3d 515, 535 (Tex.App.-Austin 2009, no pet.) (stating that intermediate appellate courts should be reluctant "to recognize a new common-law duty that has no existence in established law" (citing *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex.2002))), and no Texas case has suggested that an architect could be liable to a third party in the circumstances present in this case.

Although we ultimately conclude that the Smiths are not entitled to recover

---

**3.** The jury charge did not submit a negligent-undertaking theory through an instruction regarding whether the Architects knew that they were performing services that were necessary for the Smiths' protection and whether the Smiths relied on the Architects' performance. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837–39 (Tex.2000) (listing elements of negligent-undertaking claim and concluding that appellants could not have been held liable for negligent undertaking because jury charge omitted elements of that claim); *see also* Restatement (Second) of Torts § 323 (1965) (stating that one who undertakes to render services for another "which he should recognize as necessary for the protection of the other's person or things" is liable to "the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if" failure increases risk of harm or harm is suffered because of other's reliance on undertaking).

against the Architects because the Architects owed no duty of care to the Smiths, the perceived harshness of that conclusion should be tempered with the knowledge that the Smiths and others similarly situated may recover from those who actually owed them a duty. In fact, as mentioned above, the Smiths sought and obtained recovery from the homeowners and the general contractor. Although the dissent may voice its disagreement with the existing boundaries of the law, it is the very nature of law to impose limits to both conduct as well as recovery. Moreover, we cannot embrace the dissent's prophesy that the result we reach in this case will allow architects to "turn a blind eye to open and obvious structural defects and escape liability"; nor can we endorse the dissent's assertion that balconies will be falling from the sky with absolute impunity. As the earlier settlement demonstrates, there are legal consequences for those who negligently build balconies. Further, although architects entering the type of agreement at issue in this case may not owe a duty to the house guests of their clients, they do owe a duty to their clients to endeavor to guard against defects and will be liable to their clients if they fail to comply with that duty.

## DISCUSSION

As mentioned above, the jury found that the Architects were negligent and that their negligence proximately caused the Smiths' injuries. Although the Architects characterize their assertions as a single issue on appeal, they raise several related challenges to the jury's determination. First, they assert that they did not owe a duty to third parties such as the Smiths to identify the balcony defects. Second, they contend that the agreement that they entered into with the Maxfields did not impose on them the obligation to ensure or guarantee that the home was built in compliance with their drawings and specifica-

tions. Finally, the Architects argue that even if they owed a duty to the Smiths, the evidence presented during trial was legally insufficient to support a determination that they had, in fact, breached that duty. The Smiths, on the other hand, assert that the jury's determination should be upheld because the Architects owed them a duty to identify the defects and because legally sufficient evidence was presented during the trial showing that the Architects breached that duty. Because we ultimately conclude that any potential duty to identify defects would not have extended to the Smiths, we need not address the Architects' second or third subissues.

To prevail on a claim of negligence, a plaintiff must provide proof of the following three elements: "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 591 (Tex. App.-Fort Worth 2008, pet. denied); *see Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). In order to satisfy the duty element, the "plaintiff must establish both the existence and the violation of a duty owed to the plaintiff by the defendant." *Phillips*, 801 S.W.2d at 525. If the defendant has no duty, then he cannot be held liable for negligence. *Morgan Chase*, 302 S.W.3d at 530. In general, an individual has "no duty to take action to prevent harm to others absent special relationships or circumstances." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000). A duty may be "assumed by contract or imposed by law." *Morgan Chase*, 302 S.W.3d at 530. The existence of a duty "is a question of law for the courts to decide from the facts surrounding the occurrence in question." *Phillips*, 801 S.W.2d at 525. Accordingly, appellate courts review de novo a determination re-

garding whether a legal duty is owed. *See Block v. Mora*, 314 S.W.3d 440, 444–45 (Tex.App.-Amarillo 2009, pet. dism'd).

### No Duty was Assumed by Contract

■ In asserting that the district court's judgment should be upheld, the Smiths argue that the Architects had a duty to act as reasonable and prudent architects. Further, they assert that the Architects' duty in this case included the obligation to protect the Maxfields (the owners of the home) by observing the construction of the home to determine if the home was being built in compliance with the design plans and by reporting any observable deviations from the construction plans to the Maxfields. As an extension of this duty, the Smiths also assert that the Architects owed them a duty as third-party beneficiaries to the agreement between the Maxfields and the Architects.

As support for these assertions, the Smiths refer to the language of the standard-form contract that the Maxfields and the Architects entered into. The only parties to that agreement were the Architects and the Maxfields. Under the agreement, in addition to seeking design services, the Maxfields also paid the Architects for "contract administration services" during the construction of the residence. With respect to the provision of these services, the contract required the Architects to visit the work site, to inform the Maxfields regarding the progress of the construction, to generally determine if the construction was being performed in the manner agreed to, to report "known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor," and "to endeavor to guard the [Maxfields] against defects and deficiencies in the Work." In fact, the agreement authorized the Architects "to reject Work that does not conform to the Contract Documents" and to inspect or test "the Work." [4]

4. The language of the relevant provisions of the contract provides as follows:

**2.6.5** The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the state of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 12, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

**2.6.6** The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

. . . .

**2.6.10** The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect shall have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to

Furthermore, the Smiths refer to testimony by the Architects and Mrs. Maxfield[5] regarding the contract and the obligations imposed. In particular the Smiths point to testimony by Black indicating that he had a duty to the Maxfields to report any problems with the construction that he observed[6] and to testimony by Mrs. Maxfield stating that part of the reason that she hired Black was because he had supervised the construction of her friend's home "very conscientiously," explaining that it was her understanding that the Architects were obligated under the agreement to regularly visit the construction site and to inform her and her husband regarding any aesthetic or structural issues, and describing that it was her expectation that "there would be supervision that the house was being built."

In light of the preceding, particularly the Architects' obligation to "endeavor to guard ... against defects and deficiencies" and to generally determine if construction of the home is being done in accordance with the construction plans, the Smiths assert that the Architects owed the Maxfields the duty to protect them from variances in the design plans. Moreover, they insist that although they have no contractual relationship with the Architects, the Architects' duty also extended to them as third-party beneficiaries to the agreement.

An individual is a third-party beneficiary to a contract only if the contracting parties intended to secure a benefit to the third party and also "entered into the contract directly for the third party's benefit." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex.2002). If the benefit is merely incidental, the third party has no right to recover. *Id.; see also Loyd v. ECO Res., Inc.*, 956 S.W.2d 110, 134 (Tex.App.-Houston [14th Dist.] 1997, no pet.) (explaining that "fact that a person is directly affected by the parties' conduct ... does not make him a third party beneficiary"). Moreover, the contract "must clearly and fully express an intent to confer a direct benefit to the third party"; in other words, a third-party-beneficiary status may not be created by implication. *Stine*, 80 S.W.3d at 589. There is a presumption against third-party-beneficiary agreements, and accordingly, all doubts must be resolved against a finding that an individual is a third-party beneficiary. *Raymond v. Rahme & Williams Invs.*, 78 S.W.3d 552, 561 (Tex.App.-Austin 2002, no pet.). The intent of the contracting parties must be determined by examining the entire contract, and courts should give effect to all of the contract's provisions. *Stine*, 80 S.W.3d at 589.

Although the Smiths correctly point out that the contract imposed a duty on the

---

exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

5. Robert Maxfield did not testify at trial. In their appellate briefs, the Smiths also refer to deposition testimony from both of the Maxfields that they attached as an exhibit to their briefs; however, those depositions are not part of the appellate record. *See* Tex.R.App. P. 34.1 (setting out contents of appellate record); *see also Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498, 501 (Tex.App.-Austin 1991,

writ denied) (explaining that materials outside record that are improperly attached to party's brief may not be considered on appeal).

6. During the trial, Black also testified that he considered contract administration services to include making periodic site visits to observe the progress of the work, endeavoring to protect the owner against defects and deficiencies, trying to make sure the home is generally built in compliance with construction documents, and checking shop drawings against the design intent. Black further testified that in performing contract administration for the Maxfields, the Architects averaged two visits to the construction site per month.

Architects "to endeavor to guard against" defects and deficiencies in the construction of the home and to generally ascertain whether the home was being built in compliance with the construction plans, those responsibilities were contracted for the benefit of the Maxfields. Nothing in the language of the contract demonstrates that these duties were to be engaged in for the benefit of third parties. On the contrary, the agreement specifically stated that "[n]othing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the [Maxfields] or [the] Architect[s]." *Cf. Dukes,* 252 S.W.3d at 594 (explaining that architect's "duty depends on the particular agreement entered into with his employer").

In light of the preceding, particularly the clear language expressly disavowing third-party beneficiaries, we must conclude that when the Architects entered into the agreement with the Maxfields, they assumed no contractual duty to third-parties to the agreement, including the Smiths. *See MCI Telecomms. Corp. v. Texas Utils. Elec. Co.,* 995 S.W.2d 647, 651–52 (Tex. 1999); *Morgan Chase,* 302 S.W.3d at 531.

**No Duty was Imposed Under Common Law**

■ In addition to their assertion that the Architects owed them a duty under the contract, the Smiths also contend that the Architects owed them a duty under common law. Although no cases have imposed a duty under the circumstances present in this appeal, the Smiths nevertheless seek the creation of a duty not previously recognized under Texas law. When making this assertion, the Smiths note that a determination regarding the existence of a duty depends on "several interrelated factors," including the foreseeability and likelihood of injury. *See Phillips,* 801 S.W.2d at 525 (listing factors for courts to consider when determining whether defendant owed duty to plaintiff). Further, the Smiths insist that those factors are satisfied in this case because "the for[e]seeability and likelihood of injury from a failure of a balcony hanging over twenty feet above a stone structure is apparent and well-known to all liable parties." In other words, the Smiths urge that the Architects' owed a legal duty extending to them as house guests because they were "foreseeable users." In addition, the Smiths assert that due to the dangers resulting from faulty construction and due to the public's reliance on architects, "public policy demands that contractual privity not be an indispens[a]ble requirement for a duty of care to houseguests, or other for[e]seeable users of the balcony." *See Hermann Hosp. v. National Standard Ins. Co.,* 776 S.W.2d 249, 252–53 (Tex.App.-Houston [1st Dist.] 1989, writ denied) (explaining that although contractual relationship "assures a sufficiently close nexus between the parties upon which [courts] may fairly predicate liability, it is not ... indispensable to the imposition of a legal duty of care").

Arguably the foreseeability and likelihood-of-injury factors could be viewed as weighing in favor of extending an architect's duty of care. If an architect fails to identify and report a structural defect, a risk of harm can exist. Likewise, when the defect implicates critical safety or structural integrity concerns, one would suspect an increased likelihood of physical injury. It is also foreseeable that the risk of physical injury includes harm to third-party visitors, as it would seem to be a rare case where no person would use a structure other than the owner with whom an architect contracts.

■ However, foreseeability and likelihood of injury are not the only factors to consider when deciding whether a duty exists. Rather, the risk, foreseeability, and likelihood of injury are to be weighed

against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the actor. *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994). In addition, a court may consider whether one party has superior knowledge of the risk, whether one party has a right to control the actor who caused the harm, *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex.1993), and whether legislative enactments evidence the adoption of a particular public policy significant to the recognition of a new common-law duty, *Thapar v. Zezulka*, 994 S.W.2d 635, 639–40 (Tex. 1999).

The "right to control" consideration weighs against extending an architect's duty to third parties in this case. *See Loyd*, 956 S.W.2d at 130 (explaining that right to control is "often the deciding factor" when determining existence of legal duty). In the "absence of a relationship between the parties giving rise to the right of control, one person is under no legal duty to control the conduct of another, even if there exists the practical ability to do so." *Graff*, 858 S.W.2d at 920; *compare Van Horn v. Chambers*, 970 S.W.2d 542, 546–47 (Tex.1998) (finding no inherent right to control in physician-patient relationship that would impose duty on physician to protect third parties from patient), *with Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309–11 (Tex.1983) (explaining that if employer exercises control over employee because employee has become incapacitated, employer has duty to prevent employee from causing unreasonable risk to others). The right to control can arise both by contract and by actual exercise of control. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783–84 (Tex.2001) (concluding that more than scintilla of evidence existed showing that general contractor retained control over safety features and approved use of faulty safety device). One's duty of care with respect to another party's work "is commensurate with" the control he retains over that work. *See id.*

The agreement between the Architects and the Maxfields specified that although the Architects had the ability to reject the work done by Nash, they had no power to control the actual construction work performed at the site. *See Shepherd Components, Inc. v. Brice Petrides–Donohue & Assocs.*, 473 N.W.2d 612, 616 (Iowa 1991) (concluding that engineer did not owe duty of care to others because engineer had no right to control work performed and only had "responsibility for quality control"); *see also Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) (explaining that "right to control must be more than a general right to order work to stop and start, or to inspect progress"). Specifically, the agreement provided that the Architects "shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work." Instead, the agreement explained that those obligations "are solely the Contractor's [Nash's] rights and responsibilities." Further, the agreement specified that the Architects were responsible for their own acts or omissions but that they "shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work." Similarly, the agreement stated that the Architects were not "responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents." In addition, the agreement explained that neither the authority bestowed on the Architects by the agreement "nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect[s] to

the Contractor, Subcontractors, ... their agents or employees or other persons or entities performing portions of the Work."

Although not confronted with identical contractual language, a court of appeals analyzing a similar contractual agreement determined that no right to control was authorized by the agreement. *See Romero v. Parkhill, Smith & Cooper, Inc.*, 881 S.W.2d 522, 526 (Tex.App.-El Paso 1994, writ denied). In *Romero*, an engineer entered into an agreement with a city to provide engineering services for the construction of a plant. *Id.* at 524. Under the agreement, the engineer agreed to make periodic visits to the construction site to "observe the progress of the executed work and to determine in general if such work meets the ... requirements of the contract documents" and to inspect the construction and determine if it has been completed in accordance with the contract documents. *Id.* at 525–26. However, the agreement also specified that the engineer was not obligated to "make exhaustive or continuous on-site inspections to check the quality or quantity of the work"; was not "responsible for the construction means, methods, techniques, sequences or proce-

dures"; and was not "responsible for the acts or omissions of the contractor [or] any subcontractor." *Id.* Ultimately, the court determined that nothing in the contract between the city and the engineer gave the engineer the right to control the construction and, accordingly, that the engineer did not have a duty of care to an employee of a subcontractor to keep the premises safe.[7] *Id.* at 524, 527.

In contrast to the agreement between the Architects and the Maxfields, the construction contract between the Maxfields and Nash gave Nash the absolute right to control the worksite and the means of construction and also imposed on Nash significant supervisory responsibilities and liability.[8] *See Hobson v. Waggoner Eng'g, Inc.*, 878 So.2d 68, 76 (Miss.Ct.App.2003) (concluding that engineer had no duty to warn, in part, because general contractor had "full and absolute. control over the work site and the means and methods of construction"). Specifically, the agreement stated that Nash "shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect[s] ... or by tests, inspections or

7. Other jurisdictions that have addressed this type of contract have reached similar conclusions. *See Hobson v. Waggoner Eng'g, Inc.*, 878 So.2d 68, 73–76 (Miss.Ct.App.2003) (concluding that engineer owed no duty to warn or protect general contractors or subcontractors); *Shepherd Components, Inc. v. Brice Petrides–Donohue & Assocs.*, 473 N.W.2d 612, 615–17 (Iowa 1991) (deciding that engineer did not owe duty of care to others and, therefore, could not be liable for negligence of general contractor regarding safety procedures used on construction site); *Yow v. Hussey, Gay, Bell & DeYoung Int'l*, 201 Ga.App. 857, 412 S.E.2d 565, 567–68 (1991) (determining that engineer owed no duty to person who was not involved in construction project but was injured when he entered construction site); *Welch v. Grant Dev. Co.*, 120 Misc.2d 493, 466 N.Y.S.2d 112, 114–16 (N.Y.Sup.Ct. 1983) (affirming summary judgment against

worker injured on construction site because contract stripped architect of supervisory powers and placed all supervisory responsibility in hands of contractor); *Gordon v. Holt*, 65 A.D.2d 344, 412 N.Y.S.2d 534, 536–37 (N.Y.App.Div.1979) (concluding that architect who had duty to periodically inspect construction and report to owner of property did not have duty to future owners and tenants); *Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.*, 84 Wis.2d 1, 267 N.W.2d 13, 15–16 (1978) (affirming summary judgment against carpenter hired by general contractor because contract did not require architect to insure safety of construction site).

8. The agreement signed by the Maxfields and by Nash directly incorporated rights and responsibilities outlined in "the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201–1997."

approvals required or performed by persons other than the Contractor." Moreover, the agreement also explained that Nash "shall supervise and direct the work[;] .... shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work[;] .... shall be responsible to the [Maxfields] for acts and omissions of [Nash's] employees [and] Subcontractors[;]" and "shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition." In addition, the agreement provided that Nash "warrants to the [Maxfields] and [the] Architect[s] ... that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents." Finally, the agreement explained that the "Contractor shall indemnify and hold harmless the [Maxfields and

the] Architect[s] ... from and against claims, damages, losses and expenses ... to the extent" that the claims, damages, or losses were "caused by the negligent acts or omissions of [Nash or] a Subcontractor." [9]

Moreover, nothing in the record establishes that the Architects exercised actual control over the construction of the balcony. *See Lee Lewis Constr.*, 70 S.W.3d at 783 (explaining that although determining what contract says is generally question of law, "determining whether someone exercised actual control is [ ] generally a question of fact for the jury"). Although the testimony of various witnesses demonstrates that the Architects performed the functions outlined in the contract, none of the testimony or evidence presented indicates that the Architects exerted the type of control over the manner and method of the construction of the balcony as to warrant the imposition of the duty suggested by the Smiths.[10] *See City of Keller v.*

9. Even though the agreement empowered Nash to hire subcontractors to perform construction projects, it also allowed either the Maxfields or the Architects to object to Nash's choices. However, the Architects did not have the authority to supervise the subcontractors. *See Hobson*, 878 So.2d at 76 (noting, when determining that engineer owed no duty to workers at construction site, that engineer did not have authority to supervise subcontractors).

10. When asserting that the Architects owed them a duty, the Smiths refer to actions taken by the Architects that they allege exceeded the Architects' duties under their agreement with the Maxfields. The agreement required the Architects to "review and certify the amounts due [to Nash] and [to] issue certificates in such amounts." As proof that the Architects exceeded the scope of the agreement, the Smiths point to the language in some of the certificates that stated that the Architects had "inspected" the construction. Those certificates were prepared by Nash and provided, in relevant part, as follows:

Architect's signature below is his assurance to Owner, concerning the payment herein

applied for, that (1) Architect has inspected the Work represented by this Application, (2) such Work has been completed to the extent indicated in this Application, and the quality of workmanship and materials conforms with the Contract Documents....

In light of these certificates for payment, the Smiths contend that the Architects had agreed to ensure "that the construction was progressing according to the construction documents."

Even assuming that the Architects' review of the payment applications did impose some additional obligation on them, that obligation would have extended to the Maxfields for whom the Architects agreed to perform that task. In fact, the certificates relied on by the Smiths and the agreement between the Architects and the Maxfields specified that the Architects' certifications for payment were assurances and representations to the Maxfields. Moreover, the imposition of an obligation to inspect is inconsistent with the terms of the agreement, which clarified that the "issuance of a Certificate for Payment shall not be a representation that the Architect[s] ha[ve] (1) made exhaustive or continu-

*Wilson,* 168 S.W.3d 802, 810 (Tex.2005) (explaining that courts sustain legal-sufficiency challenges when record reveals complete absence of evidence of vital fact, that evidence offered to prove vital fact is no more than mere scintilla, or that evidence conclusively establishes opposite of vital fact).

Regarding the social utility of the Architects' conduct, under the agreement between the Architects and the Maxfields, the Architects agreed to report all known deviations from the design. In addition, the contract gave the Architects the authority to require inspection of the structure. There is significant social utility in having the architect responsible for designing a structure also agree to provide some oversight regarding whether the structure is being built in accordance with the design. In general, homeowners will not have the requisite knowledge or training to be able to ascertain whether the construction is progressing properly or to provide a check to potential builder incompetence, and any involvement by an architect during the construction will provide some potential check and will also encourage adherence to the design. Moreover, if an architect is able to identify deviations from the design plans early in the construction process, the architect will be able to minimize the cost of corrective construction and limit the need for expensive rehabilitative modifications occurring after the home has been constructed.

Indeed, the record reveals several instances in which the Architects' services were beneficial because they were able to identify multiple deviations from the design early on in the construction process and were able to provide advice regarding ameliorative actions that could be undertaken to prevent the need for more costly repairs later. For example, during one of their earlier visits to the site, the Architects notified Nash that the "framer had framed a wall too high," and the wall was lowered to comply with the design drawings. In addition, the Architects also asked Nash to place caps on the ends of the metal pipes used in the structure in order to avoid problems with insects building nests in the pipes. Further, a field report prepared by the Architects revealed deviations from the plan that they identified regarding the kitchen bay window and regarding the placement of lights and electrical outlets.

The magnitude of the burden urged by the Smiths would also be significant. It is

ous on-site inspections to check the quality or quantity of the Work [or] (2) reviewed construction means, methods, techniques, sequences or procedures." In addition, as we previously mentioned, this case does not involve a negligent-undertaking claim, but we do note that nothing in the record indicates that the Smiths ever reviewed these certificates or relied on them in any manner. *See Stutzman,* 46 S.W.3d at 837–39 (listing elements of negligent undertaking).

Furthermore, when discussing these certificates, Black testified that the language of those certificates did not comply with the language of the agreement and that the Architects only agreed to use them so that Nash could retain them for his records. Black further clarified that he did not inspect the work as part of the payment certifications and explained that the Architects prepared their own certificates that they sent to the Maxfields along with Nash's certificate and that the parallel forms were consistent with the language of the agreement. The parallel forms provided as follows:

> In accordance with the Contract Documents, based on on-site observations and the data comprising the above-referenced Application for Payment, the Architect certifies to the Owner that to the best of Architect's knowledge, information, and belief, the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the Amount Certified, including overage as described in documents provided by the Contractor.

noteworthy in this case that the Architects did not notice the defects at issue. During trial, Black testified that when he reviewed various photographs of the construction work to determine if the balcony was built "[i]n compliance with the design intent," he did not notice the defects or deviations from the design drawings.[11] In other words, this is not a case in which an architect noticed a defect but failed to report the defect despite having a duty to report known deviations. Furthermore, under the agreement, the Architects were only obligated to make periodic visits to the site. For this reason, the Architects might not have even had an opportunity to observe a particular project before it was completed. Moreover, as described above, Nash had control over the manner and means of construction and, accordingly, over the way in which a particular item was constructed. Accordingly, the absence of any particular piece of construction during a particular visit would not necessarily indicate that the piece would not be added later. Regardless of the limited nature of the Architects' responsibilities under the agreement, the Smiths essentially seek to impose the burden of identifying every defect.

The consequences of placing such a burden on architects would likewise be significant. Under the terms of the agreement, the Architects did not agree to be guarantors or insurers of the work of the general contractor. However, this is the practical consequence of the duty sought by the Smiths. The duty sought by the Smiths would expose the Architects to lawsuits brought by parties that the Architects could not have identified at the time of entering into the contract. To protect against liability, the Architects would have needed to effectively take on the duty of care of a guarantor so as to ensure that all critical matters were fully observed.

Holding the Architects liable would also have the consequence of curtailing the freedom of homeowners and architects to establish by contract the nature and scope of an architect's services, *see Morgan Chase,* 302 S.W.3d at 534 (explaining that freedom of contract is strongly favored public policy); *Dukes,* 252 S.W.3d at 594–95 (explaining that scope of architect's duty depends on particular agreement he entered into with his employer), and would be inconsistent with the limited role for the Architects established by the agreement. Although the agreement required the Architects to monitor the construction and to "endeavor to guard" against defects, the agreement in this case expressly limited those obligations. For example, the agreement clarified that the Architects were not "required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work" and were only required to report "known deviations." Finally, as mentioned earlier, the agreement also specified that "[n]othing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the [Maxfields] or [the] Architect[s]."

Had the Maxfields wanted the Architects to be guarantors or insurers, they could have contracted for such services and would likely have had to pay a higher fee. Instead, the Maxfields contracted for an intermediate level of services—obtaining from the Architects some oversight but not a guarantee. Under this type of agreement, the owner obtains an architect's assistance without having to pay for a full guarantee, and the architect provides

---

11. Although Black explained that he did not have a duty to spot defects, he testified that he believed that if he discovered something, he had an absolute duty to report it to the contractor.

assistance without having to incur the type of liability involved with providing a guarantee. Imposing the type of duty suggested by the Smiths onto architects under the type of industry-standard agreement at issue in this case would reduce the likelihood that architects would agree to enter into such agreements in the future or, at the very least, increase the compensation required for the architects' services, despite the significant social utility of such agreements. *See Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.,* 84 Wis.2d 1, 267 N.W.2d 13, 16 (1978) (noting that holding architect liable would render him safety supervisor, which would require continuous presence even though contract only required periodic visits).

Regarding whether the Architects had superior knowledge, there is no allegation that the Architects' design was not sufficiently communicated to the general contractor or to the subcontractor who constructed the balcony. Thus, while the Architects may have had superior knowledge regarding why the balcony required certain methods of construction, nothing in the record indicates that the Architects' knowledge regarding what methods were actually required in accordance with the design—i.e., the metal support pipes and steel plate tabs, the joist hanger, and the bolts, rim joist, and wood blocking—was superior to that of Nash (the party with the right to control the balcony's construction) or Rodriguez (the party who constructed the balcony). More importantly, given that Nash and Rodriguez were charged with the actual construction of the balcony, it cannot be disputed that they had superior knowledge of whether their actions conformed to the design plans.[12] Likewise, the Architects' knowledge of the importance of properly attaching a second-floor balcony would not be superior to that of any other party involved in the balcony's construction.[13]

Finally, there have been no legislative enactments identified by any party in this case that would evidence the adoption of a particular public policy in favor of impos-

---

**12.** During his testimony, Black admitted that he and another architect knew the design plans better than anyone else. However, the Smiths' expert witness, John Pierce, also conceded that the individuals who built the balcony were more familiar with the actual balcony and how it was constructed than anyone. In fact, he testified that the subcontractor had to know that the balcony had not been constructed in compliance with the design plans and that key components had been left out.

**13.** After analyzing whether the Architects or the subcontractor and contractor had superior knowledge, the dissent then considers whether the Architects' knowledge of the construction of the balcony was superior to that of the Smiths. Unquestionably it was. And there has been no allegation in this case that the type of threat posed by the poorly constructed balcony is "within the ordinary knowledge common to the community." *See Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W.2d 385, 388 (Tex.1991) (refusing to recognize legal duty of alcohol manufacturer to warn consumers against danger of alcoholism because risk is common knowledge). Accordingly, the dissent's comparison of the knowledge possessed by the Architects and by the Smiths seems misplaced. In this case, we are charged with ascertaining whether the Architects' alleged actions and inactions were sufficient to impose a duty of care. In making that determination in this case, the knowledge element is used to ascertain which of the parties involved in the construction of the balcony had greater knowledge of the negligent manner in which the balcony was built. *See Graff v. Beard,* 858 S.W.2d 918, 921–22 (Tex.1993) (determining that social hosts who make alcohol available to their guests do not owe common law duty to third parties who may be injured if guest becomes intoxicated and drives home; in reaching result, court compared whether host of party or guest is in better position to know guest's level of intoxication). For the reasons discussed above, we do not believe that the Architects possessed the superior knowledge.

ing a duty of care on an architect under these circumstances.[14]

Having considered all the relevant factors, we cannot conclude that the imposition of a new common law duty on architects is warranted in these circumstances. This seems particularly true in this case where the general contractor had a duty to inspect and an absolute right to control the subcontractor's work and to warrant and guarantee that work and where the injured third parties could (and did) obtain relief from the general contractor for his breach of that duty. In making their request, the Smiths ask this Court to fundamentally alter the obligations of architects working in Texas and to ignore the language contained in contracts that are used industry wide. Although there may be compelling reasons for expanding an architect's duty to use reasonable care in circumstances like those presented in this appeal, the decision regarding whether to undertake such a massive expansion is better left to courts of higher jurisdiction. *See Morgan Chase*, 302 S.W.3d at 535. Accordingly, we decline to recognize a new common-law duty under the circumstances present in this case.

For these reasons, we conclude that the Architects did not owe a duty to the Smiths and sustain the Architects' issue on appeal.

### Response to the Dissent

The dissent attempts to minimize the import of its suggestion that a duty should be created in this case by stating that the duty applies only in "the very limited circumstances present here." Specifically, the dissent states that it would only conclude that a duty exists "where the defects were open, obvious, observable to the architect, implicated critical safety and structural integrity concerns, involved significant deviations from the architect's own design drawings despite the fact that preapproval of any such deviation was required, and were overlooked by an architect who contracted to provide contract administration services."

While constructing its narrow holding, however, the dissent employs an overbroad approach. The dissent attempts to minimize the burden imposed on architects by limiting the duty to "observable" and "significant" deviations that implicate "critical safety and structural integrity concerns." Rather than limiting the circumstances in which an architect may be held liable, the dissent would essentially impose a new and wide-ranging duty upon architects. The factors identified by the dissent are fact issues that would likely survive summary-judgment challenges. Thus, provided that a plaintiff frames his cause of action in terms of the factors identified by the dissent, the architect would likely face the prospect of full litigation in order to exonerate himself in cases in which the architect very well owes no duty to the plaintiff. Accordingly, the analysis suggested by the dissent would not really seem to limit itself to the specific circumstances identified by the dissent. In addition, it is unlikely that one would know a defect's significance until the defect is actually identified, and once a failure has occurred, nearly any defect could be argued to be significant. It would be a considerable burden, then, to require an architect to have detected all

---

14. As an alternative argument supporting the jury's determination, the Smiths contend that the Architects owed them a duty of care because the Architects were agents of the Maxfields. Essentially, the Smiths argue that the Architects assumed "the duty of care by virtue of their contract" with the Maxfields, that the Architects' negligence "is directly imputed to the Maxfields," and that the duty of care was, therefore, owed to them "through that agency relationship." However, the Smiths refer to no cases or legal authority supporting that assertion, and we have been unable to find any.

defects that, in hindsight, turn out to be "significant" to a "critical" issue.

Moreover, although the dissent cites to many cases as support for creating a duty under the circumstances in this case, none of the cases cited by the dissent provides any support for the conclusion that the Architects, despite having no right of control over the construction project, owed a duty *to third parties* to discover a defect in that construction. First, the dissent relies on *First National Bank of Akron v. Cann*, 503 F.Supp. 419 (N.D.Ohio 1980), *aff'd*, 669 F.2d 415 (6th Cir.1982), for the supposition that the Architects can be liable to third parties for failing to comply with their duty to endeavor to guard against deficiencies as well as support for its evocative concept that our holding will allow architects to turn a "blind eye" to construction defects and escape liability of any kind. In that case, the court stated that an architect should not be "allow[ed] to close his eyes on the construction site, refrain from engaging in any inspection procedure whatsoever, and then disclaim liability for construction defects that even the most perfunctory monitoring would have prevented." *Id.* at 436. In making that statement, the court in *Cann* was addressing the extent of the architect's contractual obligation to observe the construction and to make periodic visits to the site. However, the court in *Cann* was discussing the obligation that the architect owed to the owner of the property in question arising from the contract that the owner and the architect entered into. *Id.* at 435–37. No suggestion was made that the architect owed any duty to individuals that were not party to the contract. Accordingly, the dissent's utilization of the impassioned language in *Cann* regarding whether an architect may ignore his responsibility to endeavor to guard and then later disclaim all liability paints an incomplete picture because it fails to provide the context in which the statement was made: in response to an architect seeking to escape liability to the property owners with whom he had contractually agreed to protect.

Similarly, the dissent cites *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933 (Tex. App.-Dallas 1987, writ denied), as support for its assessment of the scope of the Architects' duty. In *Hunt*, the owners of a construction project sued the architects *with whom they had contracted* for defects in the construction of a parking deck. *Id.* at 935. The owners asserted a breach of contract claim. *Id.* The court held that while the architects did not insure or guarantee the general contractor's work, they could nonetheless be found liable based on their contract with the owners under which they agreed to "endeavor to guard" against defects. *Id.* at 937. Although the dissent characterizes *Hunt* as presenting "essentially the same argument," there were no third-party visitors involved in *Hunt*. Thus, the court did not address the issue of whether the architect's duty under the contract would have extended to a third party as a common law duty. *See id.; see also Romero*, 881 S.W.2d at 528 (explaining that holding in *Hunt* only applies to cases in which property owner is suing architect for breach of contract that both parties entered into).[15]

The dissent then cites *Dukes*, 252 S.W.3d 586, for the proposition that the Architects are not shielded from liability even though the Smiths are not third-party

15. The dissent also cites *Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd.*, 244 Neb. 346, 506 N.W.2d 706 (1993) as support for the proposition the Architects are liable in this case. However, as with *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933 (Tex.App.-Dallas 1987, writ denied), *Gables CVF* addressed whether an architect owed a duty to the *property owner* to report deviations from the building design plans. 506 N.W.2d at 710.

beneficiaries of the contract. In *Dukes,* four people had drowned in a city-owned fountain, and their representatives sued the architects who had contracted with the city to assist with the fountain's earlier renovation. *Id.* at 590. However, the court concluded that the architects' contract with the city did not impose a duty to "report or make safe any hazards that they may have detected in the" fountain. *Id.* at 594–95. As a result, the court did not proceed to address the issue of whether such a duty would have extended to third-party visitors. *See id.*

The dissent relies on *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 517 A.2d 336 (1986), to conclude that an architect's duty of care extends to "those persons foreseeably subjected to the risk of personal injury" resulting from the architect's negligence. *See id.* at 338 (limiting duty of care to persons subjected to risk "because of a latent and unreasonably dangerous condition"). However, unlike the present case, the architects in *Whiting–Turner* did have control over the construction of the building. Specifically, the architects either were "supervising architects" or had agreed by contract "to inspect the building and to certify to the Building Inspection Department of Ocean City, Maryland, that the building was constructed pursuant to the approved building permit in accordance with the plans and specifications submitted with the original permit application and that the building was ready for occupancy." *Id.* at 339. Thus, *Whiting–Turner* does not provide precedent for this case, where the Architects, by contract, were not responsible for the finished construction but merely agreed to "endeavor to guard" against defects. In any event, *Whiting–Turner* is not a Texas case and is, therefore, not controlling to the outcome of this case.

Finally, the dissent relies on an Iowa case—*McCarthy v. J.P. Cullen & Son Corp.,* 199 N.W.2d 362 (Iowa 1972)—for its assertion that an architect cannot rely on the provisions of its contract with a property owner to avoid liability to a third party for negligence. However, that case involved *negligent design. See id.* at 370; *see also Abalos v. Oil Dev. Co.,* 544 S.W.2d 627, 633 (Tex.1976) (explaining that person has duty to prevent injury to others when he negligently creates dangerous situation). This case is not a negligent design case, and the Architects did not create the construction defect. Thus, *McCarthy* does not provide any precedent applicable to this case.

## CONCLUSION

Having sustained the Architects' issue on appeal, we reverse the judgment of the district court and render judgment that the Smiths take nothing in their suit against the Architects.

Dissenting Opinion by Justice HENSON, joined by Chief Justice JONES.

DIANE M. HENSON, Justice, dissenting.

Robert and Kathy Maxfield, a California-based couple, hired Black + Vernooy Architects ("BVA") to design a vacation home outside of Burnet, Texas. In addition to an $84,000 fee for design services, the Maxfields paid BVA a $16,800 fee to provide "contract administration services" during the construction of the residence. The agreement to provide contract administration services stated that BVA would, among other things, "endeavor to guard the Owner against defects and deficiencies in the Work." In the course of the contract administration process, BVA architects took multiple photographs depicting what they acknowledged at trial to be open

and obvious structural defects in a prominent feature of the Maxfields' home—the second-floor balcony overlooking Inks Lake. BVA reviewed these photographs, but failed to identify the structural defects or bring them to the Maxfields' attention. Shortly after construction was complete, the balcony collapsed while the plaintiffs—third party visitors to the home—were standing on it, causing significant personal injuries and leaving plaintiff Lou Ann Smith a paraplegic. The majority concludes that BVA owed no duty to the plaintiffs as a matter of law and reverses the jury verdict attributing 10% of the responsibility for the plaintiffs' injuries to BVA. Because the majority's holding allows Texas architects performing contract administration services to turn a blind eye to open and obvious structural defects and escape liability when foreseeable third parties are injured as a result, I respectfully dissent.

### Factual Background

BVA senior architect Sinclair Black testified that in providing contract administration services to the Maxfields, BVA was required to make periodic visits to the site to observe the construction and determine whether it was in compliance with the construction documents. During these visits, intern architect J.C. Schmeil took photographs of the balcony, which Black later reviewed to determine if the balcony was built "[i]n compliance with the design intent." Looking at these photographs during his testimony, Black testified that they depicted that the handrail was not connected to the wall as required, the metal support pipes were not attached with welded and bolted tabs as required,[1] joist hangers had not been used as required,[2] and the balcony was not bolted to the house in the manner required by the design drawings. Black further testified that the absence of the required rim joists and welded tabs was obvious from the photographs. Black also testified that one of Schmeil's photographs, taken from the interior of the house, depicted plywood where the rim joist and blocking should have been. Black acknowledged that at the stage of the framing process depicted in the photograph, the rim joist should have been in place and visible, and that the rim joist was critical to the structural integrity of the balcony. When asked whether the absence of the rim joist was open and obvious at the time BVA reviewed the photographs, Black answered, "It's obvious now. We didn't notice." Black stated that if he had noticed the defects visible in the photographs, he "absolutely" would have requested that the contractor correct them.

Expert witnesses for both sides testified that the absence of the rim joist was obvious in the photographs taken by Schmeil. The plaintiffs' expert, John Allen Pierce, also testified that a reasonable and prudent architect would have identified the balcony defects at the time the photographs were taken, brought the defects to the attention of the general contractor, and required that they be corrected. Pierce further testified that the defects "should have been observed" because the required elements were "clearly missing." In re-

---

1. The plaintiffs' expert witness, John Allen Pierce, testified that the metal support pipes were attached to the balcony using a type of thin metal clip that would generally be used to support "light-weight items such as electric conduit or plumbing piping."

2. Black testified that the use of joist hangers was not only required by the design drawings, but also by the 1997 Uniform Building Code, published by the International Council of Building Officials. The "purpose" provision of the code, which was entered into evidence, states that the code's purpose "is to provide minimum standards to safeguard life or limb, health, property and public welfare."

viewing the photographs taken by Schmeil, Pierce stated that the defects were "open and obvious" and "not hidden at all." Like Black, Pierce testified that the presence of the rim joist was critical to the structural integrity of the balcony. Pierce further explained that the observation of structural defects in a balcony would be critical in endeavoring to guard an owner against defects in the work.

BVA's expert witness, John Nyfeler, testified that in providing contract administration services, an architect is "expected to make periodic visits to the project site to observe the work of the contractor," "to endeavor to protect the owner against the deviations and defects in the work," and "to call to the owner's attention deviations that he observes in ... the quality of the work." While Nyfeler testified it would be possible for an ordinarily prudent architect providing contract administration services to overlook the absence of a rim joist, he also stated that the lack of a rim joist was obvious in the photographs taken by Schmeil, and acknowledged that a reasonable and prudent architect should pay special attention to a balcony's structural integrity during the contract administration process.

The contract itself required BVA to visit the site periodically (1) to become generally familiar with and to keep the Maxfields informed about the progress and quality of the work, (2) "to endeavor to guard the [Maxfields] against defects and deficiencies in the [w]ork," and (3) to determine in general if the work was being performed in a manner indicating that when fully completed, it would be in accordance with the contract documents. The contract further provided that BVA was not required to make "exhaustive or continuous on-site inspections" and would not be responsible for the acts or omissions of the contractor or subcontractors. BVA retained the authority to reject work that did not conform to the design drawings.

After hearing the evidence regarding the structural defects in the balcony and its subsequent collapse, the jury found that the plaintiffs' injuries were proximately caused by the negligence of BVA, the general contractor, and the framing subcontractor who constructed the balcony. The jury attributed only 10% of the responsibility to BVA, attributing 70% to the general contractor and 20% to the framing subcontractor.

Without reaching the issue of whether BVA breached a duty to the Maxfields, the majority concludes that any duty BVA owed to the Maxfields did not extend to foreseeable third-party visitors to the Maxfields' home. I would hold that after contracting to "endeavor to guard" against defects and deficiencies in the work, BVA owed the Maxfields a duty to identify open and obvious defects such as those at issue here. I would further hold that this duty extends to third parties whose injuries were proximately caused by BVA's breach of its duty to endeavor to guard against defects and deficiencies in the work.

### Existence of a Duty

A contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances. *Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C.*, 252 S.W.3d 586, 594 (Tex.App.-Fort Worth 2008, pet. denied). An architect's duty "depends on the particular agreement entered into with his employer." *Id.*

Here, the contract for design and contract administration services that BVA entered into with the Maxfields provided that BVA would:

visit the site at intervals appropriate to the state of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 12, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) *to endeavor to guard the Owner against defects and deficiencies in the Work,* and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents.

(Emphasis added.) The contract further provided:

the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

In *Hunt v. Ellisor & Tanner, Inc.,* 739 S.W.2d 933, 935 (Tex.App.-Dallas 1987, writ denied), a case in which a general contractor had failed to build a parking garage in accordance with the plans and specifications, the court of appeals addressed the architect's liability under virtually identical "endeavor to guard" contract language. The contract at issue in *Hunt* stated:

The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an architect, he will keep the Owner informed of

the progress of the Work, and *will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor.* The Architect will not be required to make exhaustive on-site inspections to check the quality and quantity of the Work. The Architect will not be responsible for the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, and he will not be responsible for the contractor's failure to carry out the Work in accordance with the Contract Documents.

*Id.* (emphasis added). The architect in *Hunt* made essentially the same argument made by BVA in the present case—that due to the contract language stating that the architect is not responsible for the contractor's failure to carry out the work in accordance with the contract documents, the architect's agreement to "endeavor to guard" the owner against defects and deficiencies did not expose the architect to liability for failure to identify any such defects or deficiencies. *See id.* at 936–37. The court of appeals rejected that argument, stating:

We conclude that the language said to be exculpatory constitutes nothing other than an agreement that the architect is not the insurer or guarantor of the general contractor's obligation to carry out the work in accordance with the contract documents. We reach this conclusion because the first three sentences of [the contract provision quoted above] impose a nonconstruction responsibility upon the architect; to wit: to visit, to familiarize, to determine, to inform and to endeavor to guard. In short, to provide information, not to make improvements upon the job site. Therefore, we reason that the fourth sentence of [the contract provision] ... exist[s] to emphasize the architect's nonconstruction responsibility

and to make certain that the architect "will not be responsible for the [general] contractor's failure to carry out the work in accordance with the contract documents." In short, the provider of information to the owner does not insure or guarantee the general contractor's work. *It follows, and we so hold, that the contract does not exculpate [the architect] from liability for the general contractor's failure to carry out the work in accordance with the contract documents.* *Id.* at 937 (emphasis added). Because I agree with the reasoning of *Hunt*, I would hold that while BVA is not a guarantor or insurer of the general contractor's work, it did take on "a nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard" the Maxfields from defects and deficiencies in the work. Thus, BVA may be held liable, not for the general contractor's negligence, but for a breach of its *own* duty as a "provider of information." *Id.; see also Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd.,* 244 Neb. 346, 506 N.W.2d 706, 710–11 (1993) (reviewing similar "endeavor to guard" provision and holding that language stating architect is not responsible for acts or omissions of contractor "does not absolve the architect from liability for a breach of the architect's contractual duty, if one exists, to inform the owner of deviations from the building plans when the architect has agreed to make periodic observations"). This is consistent with the contract provision stating, "The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not ... be responsible for acts or omissions of the Contractor. ..."

As the court in *Hunt* clarified, "[W]e observe the separate and independent contract obligations to [the owner] of both the general contractor and [the architect]. Each breached its obligations. [The architect] breached its obligation to observe the progress of the work and to endeavor to guard [the owner] against defects in the work." 739 S.W.2d at 939. Here, too, BVA had a nonconstruction obligation to endeavor to guard the Maxfields against defects in the work, and the jury was entitled to determine whether BVA was negligent in the performance of that duty.

The fact that the defects in question did not come to BVA's attention during the contract administration process does not alter my analysis, as BVA's admitted failure to observe visible and obvious defects affecting critical safety and structural integrity aspects of the balcony, despite taking and reviewing photographs of those defects, represents more than a scintilla of evidence that BVA did not fulfill its duty to "endeavor to guard" the Maxfields against defects and deficiencies. While BVA's expert witness testified that a reasonable and prudent architect could have overlooked the defects in the photographs, the plaintiffs' expert testified that for a reasonable and prudent architect hired to perform contract administration services, the defects "should have been observed" because the required elements were "clearly missing." The jury, as finder of fact, was responsible for evaluating the credibility of witnesses and the weight to be given their testimony. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

### Duty to Third–Party Visitors

Having reached the conclusion that BVA did in fact owe the Maxfields a duty to endeavor to guard against defects and deficiencies in the work, I now turn to the issue of whether this duty extended to third-party visitors to the Maxfields' home.

#### Contractual Privity

The majority begins its analysis by emphasizing that the plaintiffs cannot recover as third-party beneficiaries to BVA's contract with the Maxfields. While I agree that the plaintiffs are not third-party bene-

ficiaries to the contract, privity of contract is not required in a negligence claim resulting in personal injury. *See Ely v. General Motors Corp.*, 927 S.W.2d 774, 781 (Tex.App.-Texarkana 1996, writ denied) ("Although a third party could not recover under the terms of the contract unless he or she proved his or her status as third-party beneficiary, a tort duty may arise from a contractual relationship. Privity is generally not a defense to a negligence suit for personal injuries."); *Johnson v. Continental Constructors, Inc.*, 630 S.W.2d 365, 370 (Tex.App.-Austin 1982, writ ref'd n.r.e.) ("The defense of 'privity' is not permitted in suits for personal injury, whether founded upon a claim of negligence or upon a claim of strict liability ...."); *see also Council of Co–Owners Atlantis Condo., Inc. v. Whiting–Turner Contracting Co.*, 308 Md. 18, 517 A.2d 336, 343–44 (1986) (holding that duty of architect to use due care in fulfilling its contractual duties "extended to those persons foreseeably subjected to the risk of personal injury," given that "privity is not an absolute prerequisite to the existence of a tort duty"). The majority cites *Stine v. Stewart* for the proposition that a third party may recover on a contract only if "the parties intended to secure a benefit to the third party, and only if the contracting parties entered into the contract directly for the third party's benefit." 80 S.W.3d 586, 589 (Tex.2002). Unlike the third party at issue in *Stine,* the plaintiffs in this case are not attempting to bring a breach-of-contract claim against BVA to recover for an economic loss, but a negligence claim to recover damages for personal injuries.

In *Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C.,* the court recognized that the terms of an architect's contract for professional services could give rise to tort liability for injuries sustained by a non-contracting party. 252 S.W.3d at 594. In a wrongful-death claim resulting from the drowning of four individuals in an outdoor water sculpture owned by the City of Fort Worth, the court stated that it would look to the defendant architects' "April 22, 1999 contractual agreement [with the City] to determine whether [the architects] owed a duty to the decedents. The scope of [the architects'] duty is determined by this contract." *Id.* at 594–95. Reviewing the language of the contract, the court determined that in contracting with the City to review "existing conditions" in the outdoor water park, the architects did not agree to address safety issues, and therefore did not owe a duty—either to the City or to the third-party decedents—to report or make safe any hazards they might have detected. *Id.* at 595. In stating that the scope of the architects' duty to the decedents was determined by their contract with the City, the court acknowledged that negligence in the performance of an architect's contractual duties can result in liability when a non-contracting third party is injured.

While the majority emphasizes that the contract between BVA and the Maxfields provides that the agreement does not create a cause of action in favor of a third party, a similar contract provision was rejected as a limitation on negligence liability in *Ely v. General Motors Corp.*, 927 S.W.2d at 781. The plaintiff in *Ely* asserted that General Motors had breached a contractual duty to a franchisee and that this breach had proximately caused the plaintiff personal injuries. *Id.* In response, General Motors argued that the breach could not give rise to tort liability to the plaintiff because the contract between General Motors and its franchisee expressly disclaimed any duty to third parties. *Id.* The court disagreed, stating, "Neither [the franchisee] nor General Motors ... could effectively waive the negligence claims of third parties. Therefore, the disclaimer in the contract will not dis-

claim Ely's negligence claim." *Id.*[3] Similarly, neither BVA nor the Maxfields have the power to waive future negligence claims on behalf of third parties.

While parties are typically free to exempt one another from future liability, a party cannot "by contract with a third party, lay down his own rules as to when he will be liable to those whom his negligence injures." *McCarthy v. J.P. Cullen & Son Corp.,* 199 N.W.2d 362, 370 (Iowa 1972). While a contracting party is typically in a situation to protect itself from economic loss and contract for the degree of risk that it is willing to accept, third-party visitors to a vacation home should not be required to bargain for the expectation of a structurally sound second-floor balcony. Thus, the disclaimer of third-party claims in the contract between BVA and the Maxfields does not preclude us from determining whether BVA had a duty to perform its contractual obligations in a manner that would not cause injury to foreseeable third parties. *See Dukes,* 252 S.W.3d at 594 ("A contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances.").

*Existence of a Common–Law Duty*

Given that the plaintiffs' lack of contractual privity does not preclude them from recovering for their injuries, the relevant question is whether the circumstances surrounding BVA's contract with the Maxfields gave rise to a common-law duty to the plaintiffs. Whether a legal duty exists is a question of law for the court to decide from the facts surrounding the occurrence in question. *Id.* at 591. Determining whether a legal duty exists requires the balancing of "factors such as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case." *Texas Home Mgmt., Inc. v. Peavy,* 89 S.W.3d 30, 33 (Tex.2002). Other factors to consider include whether one party has superior knowledge of the risk, the right to control the actor whose conduct precipitated the harm, and the magnitude of the burden of guarding against the injury. *See Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993).

As the majority opinion points out, BVA's conduct in this case created a foreseeable risk of injury to third-party visitors. When an architect agrees to provide contract administration services, that architect's failure to notify the owner of observable and dangerous deviations from the architect's own design drawings, particularly in connection with an element like a balcony where construction in accordance with the design drawings is a critical safety issue, creates a foreseeable risk of injury for visitors lawfully on the premises. BVA architects viewed photographs depicting nails where the required bolts should have been, thin metal clips where welded tabs should have been, the absence of the joist hangers required by the design drawings and the uniform building code, and the absence of a rim joist and blocking, which Black acknowledged was critical to the structural integrity of the balcony. Given the number and nature of these defects, the risk of injury to a third-party visitor from BVA's failure to identify the defects and bring them to the owner's attention was foreseeable. The owners of a residence are not typically the only individuals to ever set foot on the premises, or

---

3. The court went on to determine that General Motors' breach of its contractual duty did not proximately cause Ely's injuries. *Ely v.*

*General Motors Corp.,* 927 S.W.2d 774, 782 (Tex.App.-Texarkana 1996, writ denied).

to walk out onto the balcony. Furthermore, there was evidence in the present case that Kathy Maxfield had indicated to BVA during the construction process that she intended to frequently host visitors at the home.[4] Photographs entered into evidence at trial also reflect that the balcony provided a view of Inks Lake, which increases the likelihood that visitors to the Maxfields' vacation home would be drawn to step out onto the balcony.[5] Under these circumstances, there was a foreseeable risk that a third-party visitor to the home would be injured as a result of BVA's failure to fulfill its "nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard." *See Hunt,* 739 S.W.2d at 937. In determining whether a legal duty exists, "foreseeability of the risk is the foremost and dominant consideration." *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990) (internal quotations omitted).

The foreseeability factor is particularly important in this case, given the public's reliance on design professionals to properly perform their contractual obligations as a matter of public safety. When a visitor to a residence, lawfully on the premises, walks out onto a balcony, the personal safety of that visitor depends on certain professionals having non-negligently performed their contractual duties with respect to the balcony. In a case where an architect was hired to perform contract administration and to "endeavor to guard" the owner against defects and deficiencies in the work, the visitor's safety depends on

the architect having fulfilled this duty using the level of care, skill, and diligence that would be exercised by a reasonably prudent architect under similar circumstances.

While the majority acknowledges that the foreseeability and likelihood-of-injury factors "arguably" weigh in favor of a finding that BVA owed the plaintiffs a duty of care, it determines that the remaining factors compel the opposite conclusion—that BVA's duty to endeavor to guard against defects and deficiencies did not extend to third-party visitors to the home. The majority places particular emphasis on the right to control the actor whose conduct precipitated the harm, pointing out that the contract did not give BVA the right to control the means or methods of construction. I agree that BVA had no duty related to the right to control the means or methods of construction. The duty that BVA owed to the Maxfields and, by extension, to foreseeable third-party visitors to the home, was a "nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard" against defects and deficiencies in the work. *Hunt,* 739 S.W.2d at 937.

The relevant consideration with respect to the issue of control is whether BVA had a "right to control the actor whose conduct precipitated the harm." *Graff,* 858 S.W.2d at 920. BVA should not be held liable for the actions of the contractor or the subcontractor, but it should be held liable for its *own* negligent performance of its *own* contractual duties. There is no question that BVA had control over its own architects

---

4. The record contains an email from Kathy Maxfield to Schmeil stating that a certain type of door would "seem less bother for a family place," as well as an email from Schmeil to Kathy Maxfield recommending rounded drywall corners because "the fact that this will be a vacation home used by lots of family may have some bearing on the decision (rounded might be able to take a little more abuse)."

The record also contains a memorandum from Schmeil to Nash stating, "[S]ince it is a vacation house that will get pretty heavy use from extended family, [Kathy Maxfield] decided to go with the rounded corners."

5. Gravely in fact testified that she had asked Smith to accompany her out onto the balcony for the purpose of enjoying the view.

and whether or not those architects fulfilled their "nonconstruction responsibility" to endeavor to guard against defects and deficiencies in the work. Under the circumstances presented here, a reasonable jury could have determined—and in fact, did determine—that by turning a blind eye to open and obvious structural defects and limiting their review of the balcony to whether it was "under the proper door opening," BVA architects precipitated the harm caused to the plaintiffs.[6]

In addressing the right of control, the majority relies on *Romero v. Parkhill, Smith & Cooper, Inc.*, in which the court held that an engineer had no duty to ensure the safety of a subcontractor's employee on a construction site because the engineer did not have the right to control the means and methods of construction. 881 S.W.2d 522, 526–27 (Tex.App.-El Paso 1994, writ denied). The plaintiffs alleged that the engineer was "negligent in its supervision, control, and inspection of the construction site" and that this negligence proximately caused the employee's injuries when he fell through a hole in the roof of a building during construction. *Id.* at 524. In the present case, however, the plaintiffs do not allege that BVA caused their injuries by a failure to control the construction site. Rather, they complain that their injuries were caused by BVA's negligence in fulfilling its obligation as a "provider of information." *Hunt*, 739 S.W.2d at 937.

I agree that BVA's liability is limited by the fact that it did not have a right to control the means and methods of construction. BVA did not have a duty to ensure that the construction site was a safe place to work, verify that the contractor was following federal safety regulations, or perform any other duty de-pendent on exercise of control over the construction site. *See Romero*, 881 S.W.2d at 526–27; *see also Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex.1999) (holding that premises owner was not liable for injuries sustained on construction site by independent contractor because owner had no right to control independent contractor's work); *Graham v. Freese & Nichols, Inc.*, 927 S.W.2d 294, 296 (Tex.App.-Eastland 1996, writ denied) (holding that engineer did not owe duty to injured employee of general contractor because engineer had no control over "the construction procedures and the safety precautions at the work site"). Despite its lack of control over the means and methods of construction, however, BVA still had a nonconstruction obligation to endeavor to guard against defects and deficiencies in the work. When an architect fails to carry out its duties under a contract with "the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances," it should be held liable to third parties that are injured by its negligence. *Dukes*, 252 S.W.3d at 594.

Another factor that the majority relies upon in determining that no duty exists is the social utility of the actor's conduct. While I agree that there is some social utility in allowing an architect to perform contract administration services, this utility quickly fades when an architect gives false assurances that it will endeavor to guard against defects and deficiencies in the work and then utterly fails to do so. BVA contractually agreed to periodically visit the construction site in order to become familiar with the work, keep the

---

6. At trial, Schmeil acknowledged that in his deposition testimony, he maintained that he had not looked for structural defects in the balcony because he believed his responsibility was limited to making "sure that it was the correct size and under the proper door opening."

Maxfields informed about the progress and quality of the work, endeavor to guard against defects and deficiencies, and determine in general if the work was being performed in a manner indicating that when fully completed, it would be in accordance with contract documents. I fail to see the social utility in allowing an architect performing these services to "close his eyes on the construction site, refrain from engaging in any inspection procedure whatsoever, and then disclaim liability for construction defects that even the most perfunctory monitoring would have prevented." *First Nat'l Bank of Akron v. Cann*, 503 F.Supp. 419, 436 (N.D.Ohio 1980), *aff'd*, 669 F.2d 415 (6th Cir.1982).[7]

Another relevant factor in determining the existence of the duty is whether one party has superior knowledge of the risk. *Graff*, 858 S.W.2d at 920. The majority contends that BVA's knowledge of the design plans would not be superior to that of the general contractor, as the party with the right to control the manner and means of construction, or of the subcontractor, as the party who physically constructed the balcony. While both the contractor and subcontractor had the opportunity and the obligation to review and follow BVA's design plans, there is a reason the Maxfields paid BVA $84,000 to create those plans. The relative importance of each element of the design plans, the potential for accept-

able alternatives, and the consequences of any deviations from the plans would be within the particular knowledge of the licensed professional architect who prepared them. BVA's position of superior knowledge is exemplified by the fact that neither the contractor nor the subcontractor was authorized to deviate from the design plans without first obtaining the approval of BVA. The balcony design drawings, which were entered into evidence, included the following notation: "Installation or completion of building elements in direct conflict with intent of drawings (as expressed in architectural documents) will not be acceptable without written approval from architect." Every entity on the construction site looked to BVA as the ultimate authority on the design plans. As the party with final approval and authority over the design of the home, BVA had superior knowledge of the risk related to any deviations from its own drawings.

Furthermore, it is beyond dispute that between BVA and any third-party visitor to the home who might choose to walk out on the balcony, the party with superior knowledge of the risk would be the team of architects with years of professional training who actually designed the home and conducted periodic site visits during the construction phase in order to endeavor to guard against defects and deficiencies in the work.[8] Thus, I would view the factor

---

**7.** The court in *Cann* was faced with a contract similar to the one at issue here, providing that the architect was not required to make continuous on-site inspections to check the quality and quantity of the work and was not responsible for the contractor's failure to complete the work in accordance with the plans. *First Nat'l Bank of Akron v. Cann*, 503 F.Supp. 419, 436 (N.D.Ohio 1980), *aff'd*, 669 F.2d 415 (6th Cir.1982). Nevertheless, the court stated that even where continuous on-site inspections were not required, the architect had a contractual obligation to, at a minimum, identify defects discoverable under "the most general supervision." *Id.* While the court ultimately determined that no tort liabil-

ity had been established, this holding was based on the absence of any expert testimony that a reasonable, prudent architect would have supervised the project in such a manner that the defects would have been discovered. *Id.* at 439. In contrast, the plaintiffs in the present case provided expert testimony that a reasonably prudent architect providing contract administration services would have identified the structural defects visible in the photographs and brought them to the owner's attention.

**8.** The majority contends that BVA, the contractor, and the subcontractor are the only relevant parties for purposes of comparing

related to the superior knowledge of the risk as weighing in favor of extending BVA's duty to third-party visitors.

The majority concludes that the magnitude of the burden is significant and should be given substantial weight in determining whether the duty to endeavor to guard against defects and deficiencies extends to the plaintiffs in this case. In reaching this conclusion, the majority expresses concern that architects will be forced to conduct exhaustive inspections in order to identify every possible defect in a construction project. If the duty at issue here required BVA to identify every construction defect in the Maxfields' home, I would be inclined to agree. But given the undisputed testimony that the defects were not merely visible, but open and obvious in the photographs taken by Schmeil in the course of providing contract administration services, no inspections—exhaustive or otherwise—were necessary. BVA could have discovered the defects by simply looking at the photographs.

The majority points out that a particular defect might not be visible during any of an architects' periodic site visits, and that the absence of a particular piece of construction during a particular visit would not necessarily indicate that the piece would not be added later. The existence of a legal duty must be determined based on the facts surrounding the occurrence in question. *Dukes,* 252 S.W.3d at 591. The

evidence in this case is unique in that the defects can be identified on photographs actually taken by the architects in the course of providing contract administration services. In a situation where a defect is created and then immediately obscured by walls or ceilings so that it is never observable to the architect during a site visit, no duty to identify the defect would arise. Similarly, it is possible that no duty would arise if a defect is only visible from a certain vantage point and there is no evidence that the architect ever viewed the defect from that particular vantage point. But those are not the facts of this case. In this case, Schmeil himself took photographs depicting the defects and deviations from the design drawings. There is no question that the defects were not only observable to Schmeil during his site visit, but also observable to both Schmeil and Black during their subsequent review of the photographs.

As to the possibility of missing elements being added at a later date, Black testified that at the stage of completion depicted in the photographs he reviewed, the rim joist and blocking should have been in place and visible. When questioned as to whether the contractor could have gone back after the photographs were taken and remedied some of the defects by adding joist hangers or reattaching the support pipes using welded tabs, Pierce, the plaintiffs' expert, testified that "it would be something

relative knowledge of the risk. Other Texas cases applying this balancing test to determine existence of a common-law duty have reviewed the relationship between the plaintiff and the defendant, as opposed to the relationship between the defendant and a culpable third party, to determine which party possessed superior knowledge of the risk. *See Nichols v. Tanglewood Manor Apartments,* No. 14–04–00864–CV, 2006 WL 278282, *3, 2006 Tex.App. LEXIS 975, at *8–9 (Tex.App.-Houston [14th Dist.] Feb. 7, 2006, no pet.) (mem. op.) (determining that property owner

did not owe duty to protect plaintiff from criminal act of third party where plaintiff's knowledge of past incidents of sexual assault on property was superior to that of property owner); *Ovalle v. Mares,* No. 04–04–00806–CV, 2005 WL 3532809, *2, 2005 Tex.App. LEXIS 10844, at *5 (Tex.App.-San Antonio Dec. 28, 2005, no pet.) (mem. op.) (concluding that defendant did not owe minor plaintiff duty to prevent her from getting into car with intoxicated driver where plaintiff had superior knowledge of driver's intoxicated state).

that I would certainly want to ask about because it looks like it's a permanent installation, and it's not in conformance with the [design] documents." Similarly, while BVA's counsel suggested during cross-examination that the subcontractor could have used an alternative method of installing joist hangers that would render them invisible, Pierce testified, "[I]f the joist hanger was invisible and was not apparently there, if I were the architect I would certainly inquire as to where the joist hanger is, how it's installed, what did you replace it with[.]"

Extension of the duty at issue here would not require an architect to inspect the construction site for defects, discover hidden defects, or ascertain all deviations from the design drawings, regardless of their significance or safety implications.[9] BVA simply had a duty, after contractually agreeing to visit the site periodically to "endeavor to guard" against defects and deficiencies in the work, to identify significant deviations from its own design drawings when those deviations implicated critical structural integrity concerns and were plainly visible on photographs taken and reviewed by its architects in the course of performing contract administration services. This duty should be extended to the plaintiffs in the very limited circumstances present here, where the defects were open, obvious, observable to the architect, implicated critical safety and structural integrity concerns, involved significant deviations from the architect's own design drawings despite the fact that preapproval of any such deviation was required, and were overlooked by an architect who contracted to provide contract administration services.

It is also worth noting that the magnitude of the burden at issue here is further limited by the statute of repose. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.008

(West 2002). Under this statute, a suit against any registered or licensed architect "who designs, plans, or inspects the construction of an improvement to real property or equipment attached to real property" may not be filed "later than 10 years after the substantial completion of the improvement or the beginning of operation of the equipment in an action arising out of a defective or unsafe condition of the real property, the improvement, or the equipment." *Id.*

Finally, the consequences of extending this duty to third parties are not so burdensome to the architect as to outweigh the remaining factors in favor of doing so. I disagree with the majority's contention that extension of this duty to foreseeable third parties will require an architect providing contract administration services to act as a guarantor or insurer of the work of the general contractor. On the contrary, the architect is required only to act in a reasonable and prudent manner, just as anyone else must do in order to avoid negligence liability. It cannot be a particularly onerous burden to expect an architect providing contract administration services to refrain from "clos[ing] his eyes on the construction site" and then "disclaim[ing] liability for construction defects that even the most perfunctory monitoring would have prevented." *Cann*, 503 F.Supp. at 436.

In its motion for en banc review, BVA takes the position that the consequences of extending this duty to third parties are unduly burdensome because architects will be forced to increase their fees for contract administration services and in turn, "[m]any owners of small-scale projects will choose to dispense with the architect's contract administration services." According to BVA, "[t]his result will not be in the public interest." It is unclear how this

---

9. The contract in this case did give BVA a *right* to inspect the construction.

result would negatively affect the public interest, given that under BVA's position and the majority's holding, the provision of contract administration services means an architect can charge the client thousands of dollars and do virtually nothing in return. BVA contends that the public interest would be harmed if fewer projects retain architects for contract administration services because intern architects might have difficulty acquiring the requisite number of hours of contract administration experience to become licensed architects. How many Texas balconies must crash to the ground before we dare impede the ability of an intern architect to meet his or her training requirements? Such a result would hardly appear to be in the public interest.

If Kathy Maxfield were standing on the balcony with the plaintiffs when it collapsed, the majority's holding would allow Kathy to recover for her injuries, while her guests could not. I see no compelling reason to limit BVA's liability in this manner. Given the foreseeability and likelihood of harm, BVA's superior knowledge of the risk, BVA's right to control its own architects in fulfilling contract administration responsibilities, the limited social utility of BVA's conduct in the absence of any duty to third parties, and the limited magnitude and consequences of the burden imposed by the duty, I would hold that BVA's duty to endeavor to guard the Maxfields against defects and deficiencies in the work extended to foreseeable third parties when such defects were open, obvious, and implicated critical safety and structural integrity concerns. Because the majority opinion holds otherwise, I respectfully dissent.