# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-13-00286-CV

Richard Patrick Fagerberg, Appellant

v.

Steve Madden, Ltd.; SXSW, Inc.; and W3 Event Specialists, Inc., Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
NO. D-1-GN-13-000933, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

MEMORANDUM OPINION

In 2011, Richard Patrick Fagerberg attended a concert organized by SXSW, Inc. and held at Stubb's Bar-B-Q Restaurant. Stubb's hired W3 Event Specialists, Inc. to provide security services. Steve Madden, Ltd. was a sponsor, and Stubb's allowed Madden to make a promotional video of the concert. Madden hired Onslot Creative, Inc. to make the video, and Onslot hired independent contractor Michael Brown as videographer. During the concert, Fagerberg was struck in the head by falling camera equipment and seriously injured. Fagerberg sued (1) Madden for negligence under the theories of respondeat superior and ostensible authority, negligent hiring, and negligent supervision; (2) SXSW for premises liability and negligence under the theories of respondeat superior and ostensible authority; and (3) W3 for negligence in the performance of its contractual duty to provide security services.[1] Madden, SXSW, and W3 filed no-evidence and

---

[1] Fagerberg also sued Stubb's, Onslot, and Brown but eventually settled those claims.

traditional motions for summary judgment. The trial court granted the motions, and this appeal followed. We affirm the trial court's judgment.

## Summary Judgment in Favor of SXSW and Madden

Fagerberg sued Madden for negligent supervision and negligence and sued SXSW for premises liability and negligence. He agrees that neither Madden nor SXSW hired Brown and instead asserts that they exerted or contractually retained sufficient control over Brown's and Onslot's work that they should be held vicariously liable for Brown's and Onslot's alleged negligence. We will briefly discuss the circumstances under which an entity may be held liable for the negligence of a third party.

### *Negligence and Indirect Liability*

A finding of common-law negligence requires: 1) a legal duty owed to the plaintiff by the defendant; 2) a breach of that duty; and 3) damages proximately caused by the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). The existence of a duty is the "threshold inquiry in a negligence case" and is a question of law. *Id.*; *see Texas Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002). Generally, there is no duty to protect someone from the negligence of a third person. *Peavy*, 89 S.W.3d at 34. However, an entity that employs an independent contractor may be held vicariously liable under theories such as respondeat superior or ostensible agency, *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947-48 (Tex. 1998), or negligent supervision, *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985).

In deciding whether an entity should be liable for the negligence of an independent contractor, the primary consideration is whether the entity retained control over the contractor's

2

work, either through contract or by exercise of actual control.  *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791-92 (Tex. 2006) (entity must control "the details or methods of the independent contractor's work to such an extent that the contractor cannot perform the work as it chooses"); *Sampson*, 969 S.W.2d at 947-48 (because independent contractor has sole control over means and method of work, entity that hires independent contractor "is generally not vicariously liable for the tort or negligence of that person"); Restatement (Second) of Torts § 414 (1965) ("One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.").  An entity is not liable for an independent contractor's acts unless it had some right to control the contractor's work. *Fifth Club*, 196 S.W.3d at 791-92 (employer not liable for actions of independent contractor unless employer "retains some control over the manner in which the contractor performs the work that causes the damage"); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001) (no duty to ensure that independent contractor performs work safely unless entity retains control over manner of work).[2]  Similarly, an entity in possession or control of property generally does not have a duty to see that an independent contractor is performing his work safely. *General Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008); *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999); *Redinger*, 689 S.W.2d at 417-18.  Only when the possessor retains control over the work, either

---

[2]  *See also Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998) (no liability for contractor's negligence unless entity had right to control or should be estopped from denying agency relationship); *Pollard v. Missouri Pac. R.R.,* 759 S.W.2d 670, 670 (Tex. 1988) (principal may be vicariously liable for independent contractor's negligence due to contractual retention of control).

3

contractually or by actual exercise of a right of supervision, does a duty arise.[3] *Moritz*, 257 S.W.3d at 214; *Chapa*, 11 S.W.3d at 155-56.

Finally, under the theory of ostensible agency (also called ostensible authority, apparent agency, or apparent authority), a party may be equitably barred from denying liability for the negligence of an independent contractor. *Sampson*, 969 S.W.2d at 947-48 & n.2; *see Espalin v. Children's Med. Ctr.*, 27 S.W.3d 675, 684-85 (Tex. App.—Dallas 2000, no pet.). "Liability may

---

[3] An entity in possession of premises may be held liable for: (1) negligently failing to keep the premises safe in relation to an activity on the premises (a negligent-activity theory); or (2) failure to guard against and warn of a dangerous condition (a premises-defect theory). *Clayton W. Williams Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985). "[C]ases involving potential liability for an on-premises *activity* 'are properly charged as typical negligence cases,' while cases involving potential liability for an on-premises *defect* are properly charged as premises liability cases." *Cain v. Cain*, 870 S.W.2d 676, 681 n.2 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (quoting *Physicians & Surgeons Gen. Hosp. v. Koblizek*, 752 S.W.2d 657, 659-60 (Tex. App.—Corpus Christi 1988, writ denied)).

Although Fagerberg's second amended petition invoked the theory of premises defect and although in his appellate brief he cites a dangerous-condition case, the substance of his claim was that Brown's camera work was performed negligently and, thus, was a negligent-activity claim. *See Olivo*, 952 S.W.2d at 527 (negligent-activity claim alleges injury as "contemporaneous result of someone's negligence"). Further, in his response to W3's motion for summary judgment, Fagerberg said, "This is a negligent activity case, rather than a premises case since dropping a camera on someone is a 'contemporaneous activity' rather than a condition of the property." SXSW's motion for summary judgment touched on both theories, asserting that it did not own or occupy the premises, control the use of the equipment, have a duty to detect or warn of a dangerous condition, have a duty to warn of dangers arising from Brown's activity, or know of any dangerous conditions.

Finally, Fagerberg states in his brief, without citation to authority, that the operation of the camera equipment was inherently dangerous. We disagree. "Texas courts have found very few activities so inherently dangerous as to impose a nondelegable duty," and "inherently dangerous activities are generally those that are dangerous in their normal, nondefective state." *Central Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 652-53 (Tex. 2007); *see also MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 159-60 (Tex. 1992) (Hecht, J., dissenting) (activities held not to be inherently dangerous include construction work, use of forklift to load oil drilling equipment, use of plumber's or welding torch, electrical work, blasting per se, and operation of oil refinery).

4

be imposed in this manner under the doctrine of ostensible agency in circumstances when the principal's conduct should equitably prevent it from denying the existence of an agency [relationship]." *Sampson*, 969 S.W.2d at 947. Ostensible agency operates much like an affirmative defense in that the party relying on the theory bears the burden of raising a fact issue as to each element: that "(1) the principal, by its conduct, (2) caused [the plaintiff] to reasonably believe that the putative agent was an employee or agent of the principal, and (3) that [the plaintiff] justifiably relied on the appearance of agency." *Id.* at 947-49 (citing Restatement (Second) of Agency § 267 (1958)); *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984); *see Espalin*, 27 S.W.3d at 684-85; *Drennan v. Community Health Inv. Corp.*, 905 S.W.2d 811, 820 (Tex. App.—Amarillo 1995, writ denied).

***Procedural and Factual Summary***

1. Madden's Motion for Summary Judgment

Madden filed a motion for summary judgment asserting both no-evidence and traditional grounds. In the no-evidence portion of its motion, Madden contended that there was no evidence that: Brown or Onslot were its employees; it directed or controlled any of Onslot's or Brown's work; it owed a duty to Fagerberg; it directed or controlled Brown's hiring or the filming of the event; it had a duty to ensure that Onslot and Brown were competent and performing their work in a safe manner; or it knew or should have known that Onslot or Brown posed a danger.

In the traditional portion of its motion, Madden asserted that, as a matter of law: Brown and Onslot were not Madden employees; it did not direct or control their work; it had no duty to ensure that Brown performed his work safely and was not liable under respondeat superior; it did

5

not direct or control Brown's hiring or the filming of the event; and it was not liable for negligent hiring or supervision. Madden relied on the following evidence:

- Brown's deposition statements that he did not have any communications with Madden and was not hired by Madden; that he wore black pants and a black shirt the night of the show and was not wearing anything with the Madden name on it; that he never told anyone he was a Madden representative; and that no one from Madden was involved in the setting up or operation of the camera.

- An affidavit from Gabriella Weiser, Madden's Marketing Director, who averred that Madden retained Onslot to film the concert; that Onslot and Brown were not Madden employees; and that Madden did not direct or control the manner in which Onslot filmed the concert, hire or control Brown, direct or control Brown's hiring, provide or set up any equipment, or have any knowledge about Brown's qualifications.

SXSW's Motion for Summary Judgment

2.

SXSW also filed a motion asserting no-evidence and traditional grounds for summary judgment. In the no-evidence portion of its motion, SXSW stated that there was no evidence that: it owed a legal duty to prevent Fagerberg's injuries; it breached such a duty; the breach proximately caused the injuries; it controlled the operation of the equipment; it owned or controlled the premises; or it was aware of a dangerous condition on the premises.

In the traditional portion of its motion, SXSW asserted that Fagerberg's injuries were, as a matter of law, caused by third parties over whom it had no right of control, attaching:

- Brown's answers to interrogatories, in which he stated that: he was hired by Onslot to videorecord the concert; Onslot gave him instructions on where to set up his equipment; he raised concerns about the evening's windy conditions and the fact that the ground was not level at that spot; he was assisted by people hired by Onslot; he was instructed by Onslot to get a certain shot that required him to move his equipment; in moving the equipment back to its original spot, the camera arm fell and struck Fagerberg and other audience members; and he had fourteen years of experience as a broadcast camera operator.

- Weiser's affidavit, described above.

6

- The contract between Stubb's and W3, in which W3 agreed to provide security needs and to observe and monitor the venue to "protect individuals from bodily harm from any potentially or actually hazardous or dangerous conditions and activities."

- An affidavit by Luke Potter, Creative Director for Onslot, and attached emails between him and various Stubb's and Madden personnel, discussing the concert's logistics. Potter averred that Madden hired Onslot to videotape the concert; that SXSW was not involved in Onslot's hiring; that Potter communicated with a Stubb's representative about access to the venue; that Stubb's provided the evening's schedule; that Onslot hired Brown; that a Stubb's representative told Potter where Brown's equipment should be set up; that Potter communicated with Brown during the concert about the kind of camera angles and shots Onslot wanted; and that Onslot personnel did not receive any warnings about the way the camera was being operated.

- An affidavit by Roland Swenson, President and Managing Director of SXSW, who averred that SXSW contracted with Stubb's to use the venue but did not own, operate, "rent or take possession" of the premises; that Stubb's and not SXSW was responsible for security under the venue contract; that the venue contract did not give SXSW control of the premises but only gave it "access" for purposes of setting up and holding concerts; that it did not request or arrange to videotape the concert; that no one from SXSW controlled Brown's work or gave him instructions about setting up or moving equipment; and that SXSW had no knowledge of any dangerous activities or conditions related to the filming.

- The venue contract between SXSW and Stubb's, in which the parties agreed that: Stubb's was providing a venue for the concert; Stubb's would provide all security personnel and services; SXSW was not responsible for and would not provide security; Stubb's would provide insurance for personal injuries resulting from use of the premises; and SXSW had no right to control the venue but had unlimited access for the purpose of selling merchandise and observing performances.

    Responses and Replies

3.

    One week before the hearing on Madden's and SXSW's motions for summary judgment, Fagerberg filed a second amended petition. He alleged that Madden had assumed a contractual duty to control the video production, "assumed actual control by the presence of their authorized personnel at the concert," and was negligent in its supervision of Brown's work. Fagerberg raised new allegations of ostensible agency, asserting that Onslot and Brown were acting

within express or implied authority given to them by Madden and necessary for the performance of their work; that Madden was estopped from denying their authority; and that he justifiably relied on Madden's conduct and representations that it "was in control of the production and videotaping of the concert event." As for SXSW, Fagerberg incorporated the allegations against Madden and also alleged that he was an invitee; that SXSW breached its duty to exercise ordinary care to keep the premises safe, inspect for latent defects, and remedy or warn of any dangers; and that SXSW knew or should have known that Brown's "reckless operation" of the camera equipment created an unreasonable risk of harm and did not use ordinary care to reduce or eliminate the risk or warn invitees about the danger. He further asserted that "SXSW's agents" were acting within their express or implied authority and that SXSW was estopped by its conduct from denying its agents' authority, noting that there was SXSW and Madden signage at the concert, SXSW had staffed the event with volunteers and paid personnel wearing SXSW shirts, and Fagerberg's entry wristband said "SXSW."

Fagerberg also filed almost-identical responses to SXSW's and Madden's motions for summary judgment, conceding that neither Madden nor SXSW had directly hired or supervised Brown but insisting that both had a "contractual duty"—SXSW by way of its venue contract[4] with

---

[4] The venue contract had a provision stating that the performance would not be recorded without SXSW's permission, but that provision was crossed out. There is no other contractual reference to any form of recording.

Stubb's and Madden apparently by way of its Showcase Presenter's Contract[5] with SXSW—and that the respective contracts established that Madden and SXSW both had a contractual right of control over Brown's work. Fagerberg stated that Madden's contract authorized it "to run the production of the concert" and that SXSW's contract authorized it "to essentially take over control of the concert and to run the production of the show." Fagerberg attached and "incorporate[d] . . . into this response by reference" the following evidence: a video of the accident; excerpts from Swenson's deposition; Potter's affidavit and attachments; Fagerberg's declaration; and evidence of his injuries. In the sections titled "Response to Traditional Summary Judgment," Fagerberg asserted that neither Madden nor SXSW had disproved the element of duty; that the respective contracts instead gave Madden and SXSW the right to control Brown's work and thus established their duties; and that there was "a genuine issue of material fact on the amount of control actually exercised by" Madden and SXSW. In the sections titled, "Response to No-Evidence Summary Judgment," Fagerberg stated simply that he had "raised sufficient evidence to show [he] has a viable cause of action." Fagerberg did not mention his second amended petition's allegations of ostensible agency.

SXSW and Madden filed a joint response including additional excerpts from Swenson's deposition, arguing that Fagerberg's second amended petition did not allege any new

---

[5] The "Showcase Presenter's Contract" between SXSW and Madden was included in Fagerberg's response as an attachment to Roland Swenson's deposition and labeled "deposition exhibit 2," and it is apparently this contract to which Fagerberg referred. We say "apparently" because in his response, Fagerberg stated that "the actual contract that authorized Defendant Madden to run the production of the concert" was attached as Exhibit A to the response, but the response exhibits were designated as Exhibits 1 through 5. Fagerberg also stated that the contract was "authenticated in [SXSW's] Motion for Summary Judgment[,] which is incorporated herein by reference," but the only contracts attached to SXSW's motion were the venue contract between it and Stubb's, attached to Swenson's affidavit, and the security service contract between SXSW and W3, attached to the affidavit of Cory Calhoun.

9

causes of action and that Fagerberg's responses were deficient because they did not identify evidence that would raise a fact issue on the challenged elements of his claims. Fagerberg replied, pointing to his summary-judgment declaration as being "unchallenged" evidence of the elements of ostensible agency. He also asserted that Swenson's deposition showed that SXSW retained a contractual right to control the video activities and that his response was adequate and made "adequate reference to the contract that is central to this dispute." Madden and SXSW filed a joint surreply contending that Fagerberg's declaration "merely recite[d] a personal, unsupported belief that SXSW and Madden controlled the videotaping," that there was no evidence that SXSW or Madden had held out Brown or Onslot as its agents, and that Fagerberg's "last-minute attempt to invoke 'ostensible agency' does not defeat summary judgment."

## *Discussion*

On appeal, Fagerberg argues that Madden did not conclusively disprove any elements of respondeat superior,[6] negligent supervision,[7] or ostensible agency; that SXSW did not conclusively disprove any elements of his premises-liability or ostensible-agency claims; and that he raised a fact issue as to the elements Madden and SXSW challenged in their no-evidence motions. We disagree.

---

[6] Madden asserts that Fagerberg abandoned his theory of respondeat superior in his second amended petition; Fagerberg insists he did not. Although respondeat superior and ostensible agency are alternative theories under which an entity may be held liable for the acts of another, and although Fagerberg's second amended petition only asserted Madden was liable under a contractual duty, for negligent supervision, and via ostensible agency, we will address respondeat superior.

[7] On appeal, Fagerberg states that he asserted "negligent hiring and supervision claims." However, his second amended petition asserts only that Madden (and, arguably, SXSW) was "negligent in supervising Brown." We hold that Fagerberg abandoned negligent hiring as a claim.

10

1.      No-Evidence Motions

A party moving for no-evidence summary judgment must assert that "no evidence supports one or more essential elements of a claim for which the nonmovant would bear the burden of proof at trial." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015) (citing Tex. R. Civ. P. 166a(i)).  "The trial court must grant the motion unless the nonmovant raises a genuine issue of material fact on each challenged element." *Id.*  We review a trial court's granting of a no-evidence summary judgment by looking to the evidence presented by the nonmovant in the light most favorable to the nonmovant, "crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

Madden asserted that there was no evidence that Brown or Onslot were its employees or that Madden directed or controlled Brown's hiring, any of his or Onslot's work, or the filming of the event.  It also asserted that there was no evidence it owed a duty to Fagerberg, had a duty to ensure that Onslot and Brown were competent and performing their work in a safe manner, or knew or should have known that Onslot or Brown posed a danger.  SXSW asserted that there was no evidence that it owed or breached a legal duty to Fagerberg; that such breach proximately caused Fagerberg's injuries; that SXSW controlled the operation of the camera equipment; that it owned or controlled the premises; or that it knew of a dangerous condition on the premises.

In the sections of his responses that addressed SXSW's and Madden's no-evidence motions for summary judgment, Fagerberg merely stated that he had raised sufficient evidence to show he had a "viable cause of action."  He did not point to any specific evidence, explain how the

11

evidence rebutted Madden's or SXSW's assertions of no evidence, or refer in any way to the attached evidence, nor did he mention ostensible agency or premises liability, other than to assert in his introduction that his claims were partly based on that theory. In his responses to SXSW's and Madden's traditional motions, Fagerberg merely "incorporated by reference" evidence and asserted without any explanation that the evidence showed there was a fact issue as to duty.

Even after SXSW and Madden noted those deficiencies in their joint reply, Fagerberg still did not point to any evidence as raising a fact issue on the disputed elements of his claims other than to assert that Swenson's deposition testimony (stating that a clause in the SXSW-Stubb's contract related to recording had been crossed out) was evidence "that SXSW retained the contractual right to control the video production activities" and then to ask, "If SXSW did not have the contractual right to control videotaping of the event, why did their form contract assert the right to prohibit taping? By what right did they grant permission to tape by omitting that prohibition from the agreement?" Those statements and the mere "incorporation" of evidence, without explanation of how they raised a fact issue as to the challenged elements, were insufficient to defeat Madden's and SXSW's no-evidence motions. *See Kimbrell v. Memorial Hermann Hosp. Sys.*, 407 S.W.3d 871, 878 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("When faced with a no-evidence motion for summary judgment, a nonmovant cannot avoid judgment by simply filing voluminous evidence and stating generally that a genuine fact issue has been raised."); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 330-31 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *cf. Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 309-10 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (response was

12

adequate where body of response included and referenced relevant excerpts from depositions attached in their entirety).[8]

Furthermore, looking to the evidence produced by Fagerberg in the light most favorable to his arguments, we hold that he did not raise an issue of fact as to whether SXSW or Madden exercised any control over Brown's or Onslot's work.[9] Without some evidence as to such control, Fagerberg could not establish that Madden or SXSW had any duty related to the independent contractors' work. *See Moritz*, 257 S.W.3d at 214; *Fifth Club*, 196 S.W.3d at 791-92; *Chapa*, 11 S.W.3d at 155-56; *Redinger*, 689 S.W.2d at 418. Thus, the trial court properly granted Madden's and SXSW's no-evidence motions for summary judgment.

---

[8] Although we recognize that the evidence attached to Fagerberg's motion was not voluminous, as in the cases cited above, Fagerberg still had the burden of raising a fact issue as to the disputed elements. In his responses, not only did he not specify where the court should look to find the asserted material issues of fact, he did not refer to the evidence, attempt to explain how the evidence raised such questions, or otherwise connect the evidence to the challenged elements. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2000) (although whether party adequately raised fact issues in response to no-evidence motion was "a close question," supreme court held that response was adequate where party pointed to specific facts and presented argument and authorities related to challenged elements).

[9] In asserting that Madden and SXSW had a contractual right of control, Fagerberg quoted *Pollard v. Missouri Pacific Railroad* for the proposition that a contractual retention of control can give rise to a duty of care owed by a principal to an independent contractor's employee. In *Pollard*, the railroad entered into a contract with Pollard's employer, retaining control over specifics of the job, and the supreme court held that although the railroad did not actually exercise control over the work, the fact that it contractually retained such control gave rise to a duty of care owed to Pollard. 759 S.W.2d at 670. In this case, however, neither the contract between SXSW and Madden nor the contract between SXSW and Stubb's (which contained one crossed-out clause addressing the recording of events) shows that Madden or SXSW were contractually obligated to make the video, much less contractually retained any control over the way the video was produced. *See id.*

13

2.          Traditional Motions for Summary Judgment[10]

As for the traditional portions of their motions for summary judgment, SXSW and Madden established as a matter of law that Onslot and Brown were independent contractors, not employees or agents. Brown stated that he was hired by Onslot, not Madden, and that he did not communicate with anyone from Madden; Weiser averred that Madden retained Onslot but that neither Onslot nor Brown were Madden employees and that Madden did not hire Brown or direct or control the details of the recording; Potter averred that SXSW was not involved in Onslot's hiring; and Swenson averred that SXSW did not control Brown's work.

Once SXSW and Madden showed that Brown and Onslot were independent contractors, it was Fagerberg's burden to show a genuine issue of material fact as to whether Madden or SXSW exercised control over the means or details of the recording of the concert. *See Fifth Club*, 196 S.W.3d at 791; *Chapa*, 11 S.W.3d at 155-56. However, Fagerberg simply insisted that SXSW and Madden had a contractual right to control the recording so as to give rise to a duty, despite the contracts lacking any provisions that gave SXSW or Madden a contractual right, much less duty, to manage the details of the recording. Nor did Fagerberg mention premises liability other than to state he was partially relying on that theory to hold SXSW liable for his injuries. We hold that Fagerberg failed to raise an issue of material fact on his claims of premises liability, contractual duty, or respondeat superior. The trial court did not err in granting summary judgment in favor of SXSW and Madden on those theories.

---

[10] The standards under which we review a trial court's granting of a motion for summary judgment are well-established. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (traditional motion); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003) (no-evidence motion).

3.            Ostensible Agency

Finally, we turn to Fagerberg's contention that the court erred in granting summary judgment on his ostensible-agency theory because of SXSW's and Madden's failure to directly address that claim in their motions for summary judgment (which were filed before Fagerberg amended his petition to allege ostensible agency). As we have stated, ostensible agency operates as an affirmative "defense" based on estoppel. *Sampson*, 969 S.W.2d at 947-48; *see Espalin*, 27 S.W.3d at 685. Thus, once SXSW and Madden proved Brown and Onslot were independent contractors, Fagerberg had the burden of raising a fact issue as to each element of ostensible agency. *See Sampson*, 969 S.W.2d at 947; *Espalin*, 27 S.W.3d at 685.

Fagerberg attempted to address those issues through his declaration, in which he stated that: he believed the concert "was being run" by SXSW and Madden because there were SXSW and Madden banners hanging by the stage, his entry wristband said "SXSW," and workers were wearing SXSW t-shirts; he therefore believed Madden and SXSW were "in control of the production and videotaping"; and he relied on that belief to his detriment. However, to raise a fact issue as to ostensible agency, Fagerberg had to present more than a scintilla of evidence that SXSW and Madden either affirmatively held out Brown or Onslot as their agents or employees or "lacked such ordinary care as to clothe" Onslot and Brown with apparent authority and that they had "full knowledge of all material facts," based on their conduct. *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007); *see also Sampson*, 969 S.W.2d at 949 (plaintiff must show hospital affirmatively held out physician as agent or employee or knowingly allowed physician to hold herself out as agent or employee); *Ames*, 672 S.W.2d at 450 ("A prerequisite to a proper finding of apparent authority is

15

evidence of conduct by the principal relied upon by the party asserting the estoppel defense which would lead a reasonably prudent person to believe an agent had authority to so act.").

Fagerberg established that SXSW and Madden were involved in putting on the concert and that SXSW had staffed the event with volunteers and paid staff. However, there was no evidence that Brown or anyone from Onslot displayed SXSW's or Madden's names or logos and, indeed, Brown's testimony was that he was dressed in black clothing and was not wearing anything with Madden's name on it. There is no evidence of any affirmative acts related to Brown or Onslot by Madden or SXSW, nor is there evidence that anyone from SXSW or Madden had full knowledge of the material facts, somehow sought to cloak Brown or Onslot with an appearance of authority, or knowingly allowed Brown or Onslot to hold themselves out as Madden's or SXSW's agents. *See Gaines*, 235 S.W.3d at 182-83; *Sampson*, 969 S.W.2d at 949 (quoting *Ames*, 672 S.W.2d at 450). Because Fagerberg did not produce more than a scintilla of evidence to raise a fact issue as to his theory of ostensible agency, the trial court properly granted traditional summary judgment in favor of SXSW and Madden on that issue. *See Gaines*, 235 S.W.3d at 182-84; *Sampson*, 969 S.W.2d at 947, 950; *Espalin*, 27 S.W.3d at 685; *Shaw v. Children's Med. Ctr.*, No. 05-00-01973-CV, 2002 WL 59258, at *3-5 (Tex. App.—Dallas Jan. 17, 2002, no pet.) (not designated for publication). We affirm the trial court's granting of summary judgment in favor of SXSW and Madden.

### Summary Judgment for W3

Fagerberg asserts that W3 did not conclusively disprove any of the elements of his claims and that he presented a scintilla of evidence on the elements it challenged. We disagree.

16

## *Procedural and Factual Summary*

In W3's amended motion for summary judgment, it asserted that there was no evidence that it owed a duty to Fagerberg or breached such a duty, that any breach by W3 caused Fagerberg's injury, or that W3 owned or controlled the premises. W3 also contended that, although Fagerberg claimed it knew or should have known that Brown was operating the camera erratically and did not take appropriate steps in response, the evidence established that the accident occurred when the camera equipment was being moved, not during its operation.

W3 produced evidence that Madden hired Onslot, which hired Brown; that Stubb's personnel determined where Brown's camera should be set up; and that Onslot personnel gave Brown directions related to camera shots and angles. It also provided the following testimony from Brown's deposition: the camera was often low over the crowd and this was intentional, in order to get concert footage from the crowd's perspective; no one from the audience complained to Brown about the camera being too low; shortly before the headline act was to come on stage, Brown was instructed by Onslot to get a shot that required moving the camera equipment over uneven terrain; and during this process, the equipment tipped and fell into the crowd. W3 also attached Fagerberg's deposition testimony that he had been at the concert for more than two hours before the accident occurred and that he did not see anything that gave rise to concerns about Brown's operation of the camera. Finally, W3 provided excerpts from the deposition of Ryan Garrett, Stubb's general manager, in which he testified that Stubb's did not hire W3 based on any expertise or experience with camera equipment or its operation, that W3 was not involved in setting up or operating the equipment, and that W3 had no role in supervising Brown or the people who were assisting him.

17

Garrett said W3 was hired to ensure crowd safety and "monitoring the crowd inside the venue . . . If it requires escorting off the premises, things like that where contact, human contact would come into play, we rely on them [W3] to take care of that for us."

In response to W3's motion, Fagerberg produced a copy of the contract between Stubb's and W3, in which W3 agreed to provide trained and qualified "guard protection services" and to assess the venue's security needs; design and implement a security plan; protect property, employees, and other people on the premises; and observe, monitor, and act in accordance with rules and regulations to protect against bodily harm from "potentially or actually hazardous or dangerous conditions and activities (specifically including, but not limited to, crowd activities such as moshing, stage diving, crowd surges, crowd surfing or similar crowd activities)." He also produced a declaration from Mark Couvillion, who was in attendance and who stated that before the accident, he had spoken to a W3 security member about how "it seemed to me that the camera crane operators were pushing their gear past its abilities and were swinging the crane dangerously close to the crowd." The guard responded to Couvillion that "the people operating the jib were doing it in an unsafe manner, and that he would not be surprised if someone was hurt." Finally, Brown produced W3's interrogatory answers in which it stated that its on-site supervisor twice spoke to Brown about complaints that the camera was coming too close to the crowd.

### Discussion

As we stated earlier, a plaintiff alleging negligence must show a legal duty owed to him by another, a breach of that duty, and damages proximately caused by that breach. *Black + Vernooy Architects v. Smith*, 346 S.W.3d 877, 882 (Tex. App.—Austin 2011, pet. denied) (en banc).

18

W3 alleged that it owed no duty to Fagerberg, and Fagerberg responded that it had a duty both under its contract with Stubb's and due to its exercising actual control, pointing to Garrett's deposition and Couvillion's declaration as evidence of those facts. However, the evidence showed that W3's "active participation" in the concert was through providing security and monitoring crowd activity. That evidence does not establish that W3 exercised any control over Brown or Onslot or their activities, that it had any authority to do so, either contractually or in actual fact, or that it had any reason to believe it could or should have exercised control over the filming of the concert. Instead, the evidence established that the contract between W3 and Stubb's required W3 to protect against crowd activities. Further, even if W3 had any duty under its contract, which made no mention of any direct benefit intended to be conferred upon the audience members, to protect against mishaps involving technical equipment, such a duty would have been owed only to Stubb's and would not flow through to Fagerberg or other members of the audience.[11] *See id.* at 881-82. W3 established that it did not owe a duty to Fagerberg, either under its contract with Stubb's or by way of any exercise of actual control over Brown's and Onslot's work. The trial court did not err in granting summary judgment in favor of W3.

---

[11] "Generally speaking, one has no duty to protect an individual from a third party in the absence of a special relationship between the potential actor and the individual or in the absence of a relationship that imposes a duty on the potential actor to control the third party's behavior." *Black + Vernooy Architects v. Smith*, 346 S.W.3d 877, 881 (Tex. App.—Austin 2011, pet. denied) (en banc). An individual is a third-party beneficiary to a contract only if the parties to the contract "intended to secure a benefit to the third party," the parties entered into the contract for the third party's benefit, and the contract clearly and fully expresses an intent to confer a direct benefit on the third party. *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002); *Black + Vernooy*, 346 S.W.3d at 884. An implied or incidental benefit will not suffice. *Stine*, 80 S.W.3d at 589; *Black + Vernooy*, 346 S.W.3d at 884.

19

## Conclusion

Having held that the trial court properly granted summary judgment in favor of SXSW, Madden, and W3, we affirm the trial court's judgment.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed: July 3, 2015