# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

### NO. 03-14-00131-CV

**Zbranek Custom Homes, Ltd., Appellant**

**v.**

**Joe Allbaugh; Diane Allbaugh; and**
**Rutilio Albarran Construction, Inc. d/b/a El Paso Framing, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT**
**NO. D-1-GN-10-002006, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment issued on November 3, 2015, substitute this opinion and judgment in their place, and overrule Zbranek Custom Homes, Ltd.'s motion for rehearing.

Zbranek Custom Homes, Ltd. appeals the trial court's final judgment rendered on a jury verdict in favor of Joe and Diane Allbaugh finding that Zbranek's negligence proximately caused a fire and extensive damage to personal property in the new home that they rented. Zbranek complains that the Allbaughs' claims were barred by both a waiver provision in the construction contract between Zbranek and the owner-landlord of the home and an "as is" clause in the lease; that it owed no legal duty to the Allbaughs; that the evidence was insufficient to support causation and

the value of the Allbaughs' damaged property as determined by the jury; and that the trial court erred in excluding Zbranek's expert testimony regarding a demonstration test. We will affirm the judgment.

**BACKGROUND**

Zbranek built the home in which the fire occurred under a contract with the home's owner, Bella Cima Developments, L.P. Zbranek, as the home's general contractor, engaged various independent contractors to perform different aspects of the construction, including the framing, stucco, and masonry. Under its contract with Bella Cima, Zbranek was responsible "for performance of all duties reasonably necessary to complete the Project" and ensuring that the construction complied "with all applicable laws, codes and ordinances" and was in "substantial compliance with the plans and specifications" of the architect. The home's plans called for an outdoor fireplace, which was the origin of the house fire upon its very first use following construction.

Bella Cima leased the new home to the Allbaughs. On Christmas Eve, the Allbaughs built a small fire with logs in the outdoor fireplace before the family retreated to the inside of the home while their adult son, David Birdwell, stayed outside until the fire died down. A few hours later, Birdwell was awakened by the smell of smoke. Upon investigation, he noticed "the remnants of a small fire" with virtually no flames in the outdoor fireplace and an "inordinate amount of smoke" along the "open air roof line that connects the outdoor living area to the house." After his attempts to pour water on the embers in the fireplace had no effect on the smoke, he looked inside the fireplace and noticed "a gap between the stone facing of the fireplace and the actual firebox," glowing debris in the "space between the firebox and the fascia of the fireplace," and "even some flames in [the gap]." Birdwell woke his family members, and Joe Allbaugh called the fire department.

2

The fire substantially damaged the large home as well as the majority of its contents. The official fire investigator with the fire department determined that the outdoor fireplace was the fire's area of origin and observed a gap between the firebox and the framing around it but could not say whether the gap existed before the fire occurred. He concluded that the house fire was caused by the fire in the fireplace igniting combustible materials located within the "void space" between the firebox and the framing materials.

The Allbaughs sued Zbranek as well as several of the subcontractors who performed work during the home's construction, some of whom were later non-suited or removed from the lawsuit by way of summary judgment. In its charge, the jury was asked whether the negligence of Joe Allbaugh, Zbranek, and five subcontractors proximately caused the occurrence in question. The jury answered "no" to all parties except for Zbranek and found that it had 100% responsibility for the negligence causing the occurrence. The jury awarded the Allbaughs damages of $651,396.26 for the "actual value" to them of their personal property, excluding any "fanciful or sentimental" considerations, and $73,603.74 for the reasonable cost of repairs to their personal property. The trial court rendered judgment on the verdict in favor of the Allbaughs and ordered that they recover damages from Zbranek in the amount of $715,420.[1] Zbranek filed a motion for new trial and this appeal.

---

[1] The court also ordered that the Allbaughs take nothing from Rutilio Albarran Construction, Inc. d/b/a El Paso Framing, who is not a party to this appeal, and severed the remaining third-party claims that Zbranek had brought against El Paso Framing and the stucco subcontractor.

3

## DISCUSSION

***Legal duty of general contractor***

Zbranek complains that there is legally and factually insufficient evidence to support the trial court's conclusion that Zbranek owed a legal duty to the Allbaughs because "Texas law does not impose a duty on Zbranek to third parties like the Allbaughs."[2] *See Black + Vernooy Architects v. Smith*, 346 S.W.3d 877, 882 (Tex. App.—Austin 2011, pet. denied) (holding that architect's contractual duty to homeowner did not extend to third parties because architect had no contractual right to control construction of defective balcony and did not exercise actual control over its construction). The existence of a legal duty under a given set of circumstances is a question of law for the court. *Id.* at 882-83 (appellate courts review de novo whether legal duty is owed); *see also Lawson-Avila Constr., Inc. v. Stoutamire*, 791 S.W.2d 584, 592 (Tex. App.—San Antonio 1990, writ denied) (holding that trial court did not err by failing to submit jury question about whether general contractor retained right to control independent contractor's performance because evidence of control was sufficient and because broad-form question inquiring about whether general contractor was negligent was sufficient and within trial court's discretion). We conclude that the record supports the trial court's conclusion that, under these circumstances, Zbranek owed the Allbaughs a duty to use reasonable care in the construction of the fireplace.

---

[2] In its statement of issues presented, Zbranek parenthetically mentions that "this issue includes the court's refusal to submit jury instructions relating to control," but its brief entirely fails to address this issue or cite any legal authority; Zbranek has, therefore, waived this sub-issue. *See General Servs. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 598 n.1 (Tex. 2001) (appellant's failure to brief issue on appeal waives that issue).

The supreme court has recently held that "the negligent performance of a contract that proximately injures a non-contracting party's property or person states a negligence claim," as there is a common-law duty to perform a contract with care and skill, and the failure to meet this implied standard might provide a basis for recovery in tort under appropriate circumstances. *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718-19 (Tex. 2014) (plumbing subcontractor had independent duty not to flood or damage home while performing contract with builder, and therefore homeowner—who was not party to contract between subcontractor and builder—could sue subcontractor for common-law negligence); *see Gupta v. Ritter Homes, Inc.*, 633 S.W.2d 626, 628 (Tex. App.—Houston [14th Dist.] 1982) (builder owes duty of ordinary care in construction of home, duty is not limited to first purchaser of home but extends to subsequent purchasers, and privity of contract between builder and injured party is not required), *aff'd in part, rev'd in part on other grounds*, 646 S.W.2d 168 (Tex. 1983).

This duty applies to general contractors to ensure that their subcontractors perform their work in a safe manner if the general contractor specifically retains some control over some portion of the work performed by a subcontractor or actually exercises control over the work. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 791 (Tex. 2001) (sufficient evidence of control shown where general contractor assigned its superintendent responsibility to inspect safety equipment of subcontractors, superintendent personally witnessed and approved anti-fall equipment subcontractors used, and superintendent knew about and did not object to use of system without lifeline); *Abarca v. Scott Morgan Residential, Inc.*, 305 S.W.3d 110, 124-25 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (holding following evidence sufficient to raise fact issue on general

contractor's exercise of actual control over subcontractor's work: general contractor's superintendent gave subcontractor "option" of how to acquire scaffold and permission to use its materials on site to build scaffold; superintendent was present and "supervised job" while subcontractor built scaffold; and subcontractor's supervisor gave him suggestions on how to build scaffold while superintendent was present).

We conclude that the evidence was legally and factually sufficient to support the trial court's implied conclusion that Zbranek exercised sufficient control over the construction of the fireplace so as to owe a duty of reasonable care to the Allbaughs. Steve Zbranek testified that he made the decision to install an Isokern firebox rather than the metal-insert type called for in the architectural and construction plans and that he did not consult with the architect to make such change or have the relevant plans re-drawn to so reflect. Evidence showed that he made this change after the framing subcontractors (El Paso Framing) had already framed for the smaller, metal-insert fireplace, following the architectural plans' specifications for framing (which allowed for combustible materials, such as oriented strand board (OSB), a type of plywood, to be within 8 inches of the firebox opening). There was no evidence that, after the Isokern firebox was installed, El Paso Framing employees returned to re-frame and re-sheath the fireplace with the OSB material, although it is undisputed that some party did such work. Mr. Zbranek testified that he had no knowledge of who had re-framed and re-sheathed the fireplace after the Isokern was installed, although he did testify that he personally inspected and approved of the OSB sheathing, the stucco applied over the OSB, and the stone veneer on the outside of the fireplace.

Mr. Zbranek further testified that his company supplied all of the raw materials and framing supplies for the home construction, which would necessarily have included any mortars

6

required to complete installation of the fireplace after the Isokern unit was delivered and assembled by the supplier, Fireplace Systems, Inc.—however, he could produce no evidence that any of the manufacturer's recommended fireproof mortar was ever purchased or used in the fireplace for the purpose of sealing gaps between the Isokern surface and the framing materials surrounding it. Mr. Zbranek testified that he was aware that the combustible OSB was within 8 inches of the fireplace opening and that he specifically inspected the area above the firebox at the time of construction because he knew how important it was to not have a "false chimney" (gaps through which hot flue gases could escape other than through the intended chimney). He admitted that use of the combustible materials this close to the firebox opening was in violation of the Isokern's installation instructions as well as applicable building codes and testified that, nonetheless, he permitted such construction because he believed that, since stucco is not combustible, it was acceptable to use that material to cover the OSB and seal around the firebox unit rather than the recommended fireproof mortar. There was also evidence that Zbranek was informed on two separate occasions by representatives of Fireplace Systems of the importance of following their recommended framing instructions, which included keeping combustible materials farther than 8 inches away from the firebox opening and sealing gaps between the firebox and the framing materials with the fireproof mortar, and that Zbranek did not provide the Isokern installation manual to the individuals who re-framed the fireplace.

In light of this evidence of Zbranek's exercise of control over the construction of the fireplace, we conclude that the trial court did not err in concluding that Zbranek owed a legal duty to the Allbaughs. We overrule Zbranek's third issue.

***Waiver clause in construction contract***

In its first issue, Zbranek contends that the Allbaughs' claims are barred by a waiver-of-subrogation clause in the contract between Zbranek and Bella Cima for the construction of the home.[3]  However, it is undisputed that the Allbaughs obtained their own insurance and were not parties to the construction contract.  *See Ace Prop. & Cas. Ins. Co. v. Prime Tempus, Inc.*, No. 03-06-00236-CV, 2009 WL 2902713, at *4 (Tex. App.—Austin Aug. 26, 2009, no pet.) (mem. op.) (basic tenet of contract law dictates that contract may not bind non-parties to its terms).  Nonetheless, Zbranek argues that the Allbaughs are either "successors" or "assignees" of Bella Cima, whom the contract also binds: "[Bella Cima] and [Zbranek] each binds himself or herself, successors, assigns and legal representatives to the other party and to the successors, assigns and legal representatives of the other party in all matters related to this contract."  We reject this contention, as well as Zbranek's contention that the Allbaughs are third-party beneficiaries of the construction contract and are subject to its terms under the direct-benefits-estoppel doctrine.[4]

There is no evidence that the Allbaughs, as lessees of Bella Cima, are its legal successors or assigns.  The term "successor" means, in the context of a business entity, another entity that becomes invested with the rights and assumes the burdens of the first entity by either

---

[3]  The clause provides: "[Bella Cima] and [Zbranek] waive all rights against each other and any of their Subcontractors, sub-Subcontractors, agents and employees, each of the other, for damages caused by fire or other causes of loss to the extent covered by property or casualty insurance obtained by either Owner or Builder."

[4]  Piggybacking on its waiver-clause argument, Zbranek makes the bare assertion (unsupported by any relevant legal authority) that the Allbaughs, as lessees, "could not have had greater rights than their lessor."  We will not address this argument because we have already determined that a builder may owe a duty to non-parties to a construction contract, and Zbranek has cited no authority supporting its contention that this general duty should not apply to lessees.

amalgamation, consolidation, or duly authorized legal succession. *See Enchanted Estates Cmty. Ass'n v. Timberlake Improvement Dist.*, 832 S.W.2d 800, 802 (Tex. App.—Houston [1st Dist.] 1992, no writ); *see also Farm & Home Sav. Ass'n v. Strauss*, 671 S.W.2d 682, 685 (Tex. App.—Dallas 1984, no writ) (where sales contract bound parties and their successors and assigns, term successor was "term of art which does not encompass third party purchasers" of the property). The Allbaughs are not a business entity and did not assume the legal burdens of Bella Cima through any recognized successor procedure. As for Zbranek's "assignment" argument, the construction contract provided that neither party had the right to assign the contract without the written consent of the other. There is no evidence that Bella Cima assigned the construction contract to the Allbaughs or that Zbranek gave written consent to Bella Cima to assign the contract to them.

Nor are the Allbaughs third-party beneficiaries of the construction contract. Texas courts make presumptions against third-party-beneficiary contracts, and an individual will be deemed a third-party beneficiary only if the contract clearly and fully expresses an intent to confer a direct benefit to the third party. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999) (third-party-beneficiary status may not be created by implication); *Edwards v. Schuh*, 5 S.W.3d 829, 832 (Tex. App.—Austin 1999, no pet.) ("A contract will not be interpreted as having been made for a third party's benefit unless that was clearly the intention of the contracting parties."). Even the fact that a person is directly affected by the parties' conduct does not, without more, make him a third-party beneficiary; the parties must have entered into the contract directly for the third party's benefit. *See Black + Vernooy*, 346 S.W.3d at 884. There is no evidence that the Allbaughs were intended beneficiaries of the construction contract.

9

Finally, Zbranek's attempt to bring the Allbaughs' claims under the construction contract's waiver-of-subrogation clause by application of the direct-benefits-estoppel doctrine fails. We first note that the only Texas cases to apply the doctrine have been in the context of arbitration, which is not an issue in this case. *E.g., Rachal v. Reitz*, 403 S.W.3d 840, 846 (Tex. 2013) (doctrine applies to estop non-signatory from simultaneously attempting to avoid contract's burdens, such as obligation to arbitrate disputes, and seeking to obtain its benefits); *In re Weekley Homes*, 180 S.W.3d 127, 131 (Tex. 2005) (orig. proceeding) (same); *see also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding) (if valid arbitration agreement exists, doubts regarding agreement's scope are resolved in favor of arbitration). Furthermore, the equitable doctrine does not apply when liability under a plaintiff's claim arises from general obligations imposed by state law, including torts and other common-law duties. *See In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182, 184 n.2 (Tex. 2009) (orig. proceeding); *In re Kellogg Brown*, 166 S.W.3d at 739-40 (if non-signatory's claims can stand independently of underlying contract, then arbitration should not be compelled under theory).

Through their negligence claims, the Allbaughs were not seeking to enforce the construction contract or obtain any benefits that stemmed directly from its terms. *See In re Kellogg Brown*, 166 S.W.3d at 740. Rather, as we have already discussed, Zbranek owed the Allbaughs a duty to use reasonable care in the construction of the fireplace, and their claim of breach of that duty is independent of the underlying contract. *See Chapman*, 445 S.W.3d at 718-19 (holding that plumbing subcontractor's duty to not damage owner's home while performing its contract with builder was independent of its obligation under said contract). We overrule Zbranek's first issue.

10

***"As is" clause in lease***

Zbranek next attempts to escape liability by relying on an "as is" clause in the lease entered into between Bella Cima and the Allbaughs.[5] However, Zbranek is not a party to the lease and, as a general rule, may not enforce its terms. *See Atlantic Mut. Ins. Co. v. Crow Design Ctrs.*, 148 S.W.3d 743, 744 (Tex. App.—Dallas 2004, no pet.) (holding lessee's suit against third party for negligent maintenance of air-conditioning system was not barred by waiver-of-subrogation clause in lease between lessee and landlord). Furthermore, Zbranek has not cited any applicable authority supporting its argument that an "as is" clause in a lease precludes a lessee's causes of action against the manufacturer or builder of the thing leased. *Cf. MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 142 (Tex. 2014) (noting that manufacturers do not escape liability merely because good has transferred owners, and purchaser of used good may rely on implied warranty created at time of first sale, while leaving open question of whether as-is clause in sales contract would limit secondary buyer's recourse against manufacturer because appellant had not preserved issue for review); *New Tex. Auto Auction Servs., LP v. Gomez De Hernandez*, 249 S.W.3d 400, 406-07 (Tex. 2008) (as-is clause in auctioneer's contract to sell car precluded claim against auctioneer by purchaser, but court did not address purchaser's action against manufacturer, as that claim had been severed). Accordingly, the trial court did not err in concluding that the as-is clause in the lease between the Allbaughs and Bella Cima did not foreclose Zbranek's liability, and we overrule Zbranek's second issue.

---

[5] The lease provided that "Landlord makes no express or implied warranties as to the Property's condition. Tenant has inspected the Property and accepts it AS IS."

*Evidence of causation*

In its fourth issue, Zbranek asserts that the evidence is legally and factually insufficient to show that defective installation of the fireplace caused the fire damaging the home and the Allbaughs' property. Specifically, it claims that there was an "analytical gap" in the Allbaughs' expert's testimony because it did not answer the "crucial" question of whether and how, exactly, sufficient heat had transferred from the original controlled fire in the fireplace to the combustible framing materials so as to cause them to ignite. We initially note that causation is a question of fact for the jury, which has broad latitude to infer proximate cause from the evidence and circumstances surrounding an event. *J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Beeson*, 835 S.W.2d 689, 698 (Tex. App.—Dallas 1992, writ denied); *Figure World, Inc. v. Farley*, 680 S.W.2d 33, 36 (Tex. App.—Austin 1984, writ ref'd n.r.e.). While Zbranek correctly notes that the Allbaughs' experts did not testify about what the actual temperatures were at the specific locations where they opined the fire had likely started, there was nonetheless sufficient evidence from which a reasonable fact-finder could infer that faulty construction of the fireplace caused the home fire.

There was no dispute among the parties about the origin of the fire (it began in the outdoor fireplace[6]), and there was competent testimony from the Allbaughs' experts ruling out all other possible causes (human, natural, electrical, natural gas) of ignition of the combustible materials located outside of the fireproof Isokern firebox. There was evidence of the temperature at which a wood fire burns (1880° F), the auto-ignition temperature of OSB (400-500° F), the auto-ignition

---

[6] The fire inspector further pinpointed the origin of the fire: he opined that it began inside the "void space" (the gap) between the firebox and the combustible framing materials.

temperature of the paper backing on the OSB (400° F), and the temperature of hot flue gases (as much as 800-966° F). There was expert testimony that stucco is a good conductor of heat and Birdwell's testimony that in the early stages of the fire, he observed a "gap" along the sides and top of the firebox between the firebox and the stucco and framing material (the so-called "false chimney" referenced by other witnesses). The fire inspector similarly observed a gap in the same location and noted that combustible material within the gap had burned. Mr. Zbranek himself admitted that he knew of the dangers of a false chimney.

While the Allbaughs' experts may not have connected every single dot for the jury as to how, exactly, the fire from earlier in the evening actually caused combustible material outside of the firebox to ignite, the fact that such occurrence transpired was a reasonable inference based on all the evidence in favor of the Allbaughs. *See Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 348 (Tex. 2015) (proof other than expert testimony will support jury finding when jurors' common understanding and experience will allow them to make finding with reasonable probability); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) (whether expert testimony is necessary to prove matter or theory is question of law). The Allbaughs' causation theory was not complex, and expert testimony on the exact sequence of events leading to ignition of the combustible materials framing the firebox was not necessary under the circumstances here, including: Birdwell's observation of a gap where there should not have been one, in which there were visible flames and burning debris; Zbranek's failure to use fireproof mortar in the "gap" and positioning of flammable materials too close to the fire box, in contravention of the manufacturer's installation instructions; the fire inspector's conclusion that the house fire began in the void space

13

between the fire box and the framing materials; and testimony ruling out all other potential sources of ignition of the flammable materials. From this and other evidence in the record, the jury reasonably made the simple inference that, but for the negligent construction of the fireplace, the house fire would not have occurred. *Cf. Gharda*, 464 S.W.3d at 348 (causation theory deemed complex where plaintiffs sought to prove that defendants manufactured and sold drums of chemical that was allegedly contaminated with second chemical, which caused exothermic reaction when heated by releasing flammable gases into industrial oven located in warehouse where other flammables were stored, and gases spontaneously combusted or were ignited by static electricity); *Mack Trucks*, 206 S.W.3d at 584 (juror's general experience and common knowledge do not extend to whether design defects such as those alleged in case caused releases of diesel fuel during rollover accident and whether diesel would have been source of first ignition when other possible ignition sources were present). We hold that the evidence was legally and factually sufficient to support the jury's finding on causation, and we accordingly overrule Zbranek's fourth issue.

### *Evidence of damages*

Zbranek next complains that (1) the evidence of the Allbaughs' damages is legally and factually insufficient to support the jury's award because all of the evidence on this issue went to replacement value rather than actual value and (2) the Allbaughs' expert witness on the issue was not qualified. *See Crisp v. Security Nat'l Ins. Co.*, 369 S.W.2d 326, 329 (Tex. 1963) (proper measure of damages for damaged or lost personal property is actual worth or value to owner at time of injury). While the Allbaughs did need to present evidence of the actual value of their damaged and lost personal property, we conclude that their evidence of its replacement value is sufficient, as

14

replacement value is one of the factors that fact-finders may consider in making the determination of actual value. *See id.* (fact-finders may consider original cost; cost of replacement; opinions of qualified witnesses, including owner; and use to which property was put in making actual-value determination). Zbranek has cited no authority for the proposition that the plaintiff must present evidence on all of these factors or on any more than one of them, and we decline to broaden the holding of *Crisp* to so require. Also, the Allbaughs did cursorily testify about the condition of their property (the items were in "great condition") and that they planned to use the items for a long time and pass them down to their children and grandchildren. Furthermore, the jury awarded considerably less for the actual value of the Allbaughs' property ($651,396.26) than the total amount of actual-value damages to which the Allbaughs testified ($1,345,335.68), which difference may be explained by the jury's taking into account factors such as depreciation of the property (the Allbaughs' damages expert testified that replacement-value estimates do not take into account depreciation, age, or condition). In determining damages, the jury has discretion to award damages within the range of evidence presented at trial. *See Gulf States Utils. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (also noting that "[i]t is well settled that a property owner may opine about the property's value").

We also reject Zbranek's argument that the Allbaughs' damages expert was not qualified, as there was sufficient demonstration in the record that her years of experience in making similar valuations qualified her. *See* Tex. R. Evid. 702 (expert may be qualified by knowledge, skill, experience, training, or education). The expert had worked for a company that specializes in the valuation of property for over eight years, had been a senior project manager for about five years, and had worked on over one hundred property-loss assessments and inventories in her career.

15

The trial court did not abuse its discretion in admitting her testimony. *See Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 649-50 (Tex. App.—Austin 2005, pet. denied) (we review decision that expert is qualified for abuse of discretion and must uphold evidentiary ruling if there is any legitimate basis in record to support it). We overrule Zbranek's fifth issue.

### *Exclusion of expert's demonstration test*

In its final issue, Zbranek contends that the trial court erred in excluding its expert witness's demonstration test attempting to show that the temperatures within the fireplace were too low to have caused the fire. The Allbaughs respond that the trial court properly exercised its discretion in excluding the test because it was not conducted under "substantially similar" conditions as the actual occurrence. *See Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279, 281-82 (Tex. 1964) (although conditions need not be identical, there must be substantial similarity between conditions existing at time of occurrence giving rise to litigation and those in existence at time experiment is conducted for demonstration purposes for experiment to be admissible); *Lincoln v. Clark Freight Lines, Inc.*, 285 S.W.3d 79, 84 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("When an experiment is conducted out-of-court and in the absence of opposing counsel, there must be a substantial similarity between the conditions existing at the time of the experiment and the actual event that is the subject of litigation.").

In considering whether to admit the test, the trial court considered numerous depositions, oral argument, and other materials and determined that Zbranek's fireplace mock-up and the fire built within it were not substantially similar, "given the huge number of variables at play in this situation." Dissimilarities in construction of the two fireplaces included the use of stucco

16

metal lath without a paper backing in the mock-up fireplace (while the actual fireplace's stucco lath had paper backing); the gap between the OSB and stucco framing material in the mock-up fireplace was sealed with noncombustible mortar, while the gap in the actual fireplace either was unsealed or was sealed with stucco instead of mortar; the mock-up fireplace was not "cured" (did not sit unused for a prescribed period of time), while the actual fireplace had cured for over two years; and the mock-up fireplace was a stand-alone structure in a parking lot, while the actual fireplace was part of a covered patio connected to the residence. Dissimilarities in conditions included: the ambient air, outside temperatures, humidity, and the length during which the respective fires burned. On this record, we conclude that the trial court did not abuse its discretion in excluding Zbranek's expert's proffered demonstration test, *see Lincoln*, 285 S.W.3d at 84, and accordingly overrule Zbranek's sixth issue.

## CONCLUSION

Having overruled all of appellant's issues, we affirm the district court's judgment.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed on Motion for Rehearing

Filed:   December 23, 2015

17